THE BANK OF NEW YORK, TRUSTEE UNDER THE WILL OF WILLIAM BYRD, DECEASED, PLAINTIFF-RE-SPONDENT, v. MARY MARTIN BLACK, INDIVIDUALLY AND AS EXECUTRIX UNDER THE WILL OF JULIA KINGSBURY BYRD, DECEASED, DEFENDANT-APPEL-LANT AND CROSS-RESPONDENT, AND WILLIAM BYRD, JR., LUCY CARTER BREDIN, DEFENDANTS-RESPOND-ENTS, AND ANNE SYFRET AND MARK BREDIN, DE-FENDANTS-RESPONDENTS AND CROSS-APPELLANTS.

Argued January 20, 1958—Decided March 3, 1958.

Mr. *Irving Riker* argued the cause for defendant-appellant and cross-respondent Mary Martin Black (*Messrs. Riker, Emery & Danzig,* attorneys; *Messrs. Sullivan & Cromwell* (*George C. Sharp, Lorene Joergensen,* of counsel), of the New York Bar, on the brief).

Mr. *Horace F. Banta* argued the cause for respondents and cross-appellants Anne Syfret and Mark Bredin (*Messrs. Winne & Banta,* attorneys).

Mr. *Ward J. Herbert* argued the cause for defendants-respondents William Byrd, Jr., and Lucy Carter Bredin (*Messrs. McCarter, English & Studer,* attorneys).

Mr. *Hugh N. W. Ronalds,* attorney for plaintiff-respondent The Bank of New York.

The opinion of the court was delivered by

WACHENFELD, J. As testamentary trustee under the will of William Byrd, deceased, the Bank of New York brought this action principally for the purpose of having the court determine to whom it should distribute some $334,000 in trust funds now that the trust in question has expired. Various relatives of the settlor, William Byrd, and his wife, Julia Byrd, were joined as parties-defendant.

The Chancery Division of the Superior Court decided Julia Byrd did not intend, by her last testament, to exercise the general testamentary power of appointment which she had over the subject personalty and, further, that the fund now constituted intestate property which should be equally divided among William Byrd, Jr., Lucy Carter Bredin and the estate of Julia Byrd.

Mary Martin Black appealed and Anne Syfret and Mark Bredin cross-appealed. On our own motion, we granted certification to the Appellate Division.

William Byrd died on August 6, 1952 while domiciled in Short Hills, New Jersey. His will was admitted to probate in the Essex County Surrogate's Court on August 19, 1952, and letters of trusteeship were issued thereunder to the plaintiff Bank of New York. The testator left surviving his wife, two children (William Byrd, Jr., and Lucy Carter Bredin), two grandchildren (Anne Syfret and Mark Bredin), and his stepdaughter (Mary Martin Black).

The residuary clause of William Byrd's will provided:

"ELEVENTH: I give, devise and bequeath all the rest, residue and remainder of my estate, real and personal and wherever situated as follows:

If my wife, JULIA KINGSBURY BYRD shall survive me, one third thereof to BANK OF NEW YORK AND FIFTH AVENUE BANK, a corporation of New York, having its principal office at 48 Wall Street, New York City, duly qualified to act in the State of New Jersey, IN TRUST to invest and reinvest the same and to pay the net income thereof to my wife so long as she shall live and upon her death to pay the principal as my wife shall appoint by her last Will and Testament. In the event that my wife shall die before me I give, devise and bequeath said one third share absolutely to my stepdaughter MARY MARTIN BLACK. If both

my wife and Mary Martin Black die before me, I give such share to my issue per stirpes. I give to my wife, if she shall survive me, full power and authority to withdraw the whole or any part of the capital of said trust during her lifetime and to use the same for her own benefit.

One third thereof to my son WILLIAM BYRD, JR., absolutely and forever. If my said son shall die before me I give his share to his issue me surviving per stirpes.

One third thereof in equal shares to my daughter LUCY CARTER BREDIN of 21 Camden Crescent, Bath, England, my granddaughter ANNE SYFRET of Wolverley near Kidderminster, Worcestershire, England, and my grandson MARK BREDIN. If my said grandson has not attained the age of twenty-five years at the time of my death I direct my Executors to pay him the income of his share until he attains that age and then to pay him the principal. If my said daughter or either of my said grandchildren shall die before me, I give, devise and bequeath the share of the one so dying to her or his issue me surviving per stirpes, and in default of such issue to the survivor or survivors of them."

Julia Byrd died on January 10, 1956 while domiciled at Mary Martin Black's home in Warrenton, Virginia. Mrs. Black is Mrs. Byrd's daughter by a marriage antedating her union with William Byrd in 1941. The last will and testament of Mrs. Byrd was admitted to probate by the Circuit Court of Fauquier County, Virginia. It did not by exact and specific words exercise the general testamentary power of appointment which Mrs. Byrd had over the trust fund established by William Byrd's will, and thus is provoked the present controversy among the defendants over who is entitled to the trust principal now that the trust itself has terminated.

Mrs. Byrd's will was drawn by a Virginia practitioner two months after her husband's demise. It is short and in so far as relevant provides:

"SECOND: I give, bequeath and devise all of my estate, both real and personal, or mixed, wheresoever situated, whether in being or in expectancy, to my daughter MARY MARTIN BLACK of Warrenton, Virginia. Should my said daughter MARY MARTIN BLACK predecease me, I give, bequeath and devise all of my estate, both real and personal and mixed, in equal share to my grandsons, namely JOSIAH MACY, JR., ARCHER MARTIN MACY, and NOEL EVERIT MACY, and I hereby request said

grandsons to equally share the responsibility of the care and maintenance of AUBREY HENRY MARTIN, JR."

Aubrey Henry Martin, Jr., is another grandson of Mrs. Byrd's. William Byrd, Jr., Lucy Carter Bredin, Anne Syfret, Mark Bredin and Mary Martin Black all survive the testatrix.

During the course of this litigation, the defendants have made various concessions and reached certain accommodations respecting the principles of law which they deem relevant to their claims. A brief resumè of these will serve to illuminate the import of the parties' several contentions.

Initially, we are not confronted with the necessity to resolve any problems in conflict of laws because defendants agreed in the trial court that New Jersey law should completely govern the disposition of this case. During oral argument we requested the respective attorneys to submit authorities on the question of whether the existence of an intent to execute the power should be gauged by Virginia or New Jersey law, but in reaching our decision we abide by the parties' original understanding that New Jersey law applies. It is conceded that under the statutory law of Virginia a general residuary clause is presumed to exercise a general power of appointment, but that New Jersey observes the converse of this rule.

Mary Martin Black first contends that an intention to appoint the *corpus* of the trust to her is implicit in the residuary clause of her mother's will. Failing this, she urges us to overrule our previous cases holding that a general residuary clause is not presumed, *ipso facto,* to exercise a general testamentary power of appointment. If she does not succeed on either of these two points, she then proposes that William Byrd's will be construed to establish an implied gift of the trust principal to her in default of appointment by Mrs. Byrd.

Anne Syfret and Mark Bredin oppose all of Mrs. Black's contentions and argue that the trust fund held by the bank should be divided among the residuary beneficiaries under

the will of William Byrd in proportion to their respective shares in the residue of his estate, citing *N. J. S.* 3A:3–14. This statute provides that when a residuary devise or bequest cannot take effect due to lapse or some other cause, it shall thereupon vest in the remaining residuary beneficiaries, if any.

William Byrd, Jr., and Lucy Carter Bredin, who were successful below, deny the validity of Mrs. Black's arguments and also contest the applicability of *N. J. S.* 3A:3–14, maintaining that the trust fund has now become intestate property belonging to William Byrd's next of kin under *N. J. S.* 3A:4–2.

In order to elucidate the dispositive intentions of William and Julia Byrd, evidence was adduced of the circumstances which probably motivated them at the times when they executed their respective testaments. As a result of examining the terms of Julia Byrd's will in the revealing context of her personal relationships with the parties involved and other extrinsic circumstances, we are persuaded that the relevant factors adequately combine to demonstrate an intention by the testatrix to appoint the trust property to her daughter Mary Martin Black. This conclusion makes it unnecessary to adjudicate the further conflict between the claims of Anne Syfret and Mark Bredin, on the one hand, and William Byrd, Jr., and Lucy Carter Bredin, on the other.

█ The general rule in our jurisdiction is that a residuary clause, general in its nature, will not ordinarily suffice to exercise a power of appointment. *E. g., Lippincott v. Haviland,* 93 *N. J. Eq.* 585 *(Ch.* 1922); *Farnum v. Pennsylvania Co.,* 87 *N. J. Eq.* 108 *(Ch.* 1916), affirmed 87 *N. J. Eq.* 652 *(E. & A.* 1917).

The testator must in some way express or indicate a conscious intention to execute it. In many instances the intention exists and, although imperfectly expressed, is aided and supported by surrounding circumstances and their reasonable and logical implications, while in other cases the intention is not expressed at all. Our responsibility, within

the recognized rules of construction, is to distinguish between the classifications, keeping in mind the basic principle hereinafter alluded to.

The rule has been expressed many times in varying language. In its simplest form, it appears in the early case of *Munson v. Berdan, 35 N. J. Eq.* 376, 378 *(Ch.* 1882), where the court said:

"* * * but it is not necessary that under such a power of appointment the intention to execute the power should appear by express terms or recital in the instrument—it is sufficient if the act shows that the donee had in view the subject of the power."

Some years thereafter, in *Wooster v. Cooper, 59 N. J. Eq.* 204, 223 *(Ch.* 1900), the above expression was adopted *in toto,* but it was added that:

"* * * This intention may be collected from attending circumstances, as that the will includes something the testator had not, otherwise than under the power, or that a part of the will would be wholly inoperative unless applied to the power."

In *Lippincott v. Haviland, supra,* 93 *N. J. Eq.* at *pages* 586–587, both of these pronouncements were embraced and the court said on the same subject:

"While it is not necessary that it appear by express terms or recitals in the will that testatrix was exercising the power of appointment, it must, however, appear in some form that the acts of the testatrix show she had in view the subject of the power, and intended to exercise it in the execution of her will * * *, and this intention may be collected from attending circumstances, as that the will includes something the testatrix did not have, otherwise than under the power, or that part of the will would be inoperative unless applied to the power."

Finally, we refer to the restatement and affirmation of the doctrine in *Hood v. Francis,* 137 *N. J. Eq.* 200, 204–205 *(Ch.* 1945):

"Where it appears from a reading of the will and the circumstances at the time of its execution that the testator intended to exercise a power of appointment, he must be deemed to have done so not-

withstanding he did not use any express words for that purpose. It is so well settled in law as not to require citation of authority that the Court must ascertain and give effect to testator's intention as disclosed by the entire will in light of the situation surrounding him at the time of its execution, and for such purpose extrinsic evidence is admissible. This rule likewise applies to the determination of the question whether a donee by his will intended to execute a power reserved to him."

Our adjudications have never departed from this fundamental principle, but its application to different fact patterns has brought about numerous controversies with divergent results. *E. g., Camden Safe Deposit & Trust Co. v. Fitler*, 123 *N. J. Eq.* 245 (*Ch.* 1938), affirmed *per curiam sub nom. Camden Safe Deposit & Trust Co. v. Frishmuth*, 125 *N. J. Eq.* 169 (*E. & A.* 1939); *Pennsylvania Co. etc. v. Morrell*, 108 *N. J. Eq.* 188 (*Ch.* 1931); *Paul v. Paul*, 99 *N. J. Eq.* 498 (*Ch.* 1926); and cases previously cited.

Judge Jayne, in *In re Klein's Estate*, 36 *N. J. Super.* 407, 408 (*App. Div.* 1955), artfully posed the substance of the very problem which confronts us now:

"* * * Will the court execute the clear intent of the testator which is not fully or definitely expressed in the will, or will it, by a strict technical adherence to the form of words and their literal meaning, or the absence thereof, suffer the discernible intention of the testator to be defeated?"

In arriving at the solution to this question through the process of construction, certain basic precepts must constantly be kept in mind. Thus, in *National State Bank of Newark v. Morrison*, 9 *N. J. Super.* 552, 558 (1950), the Appellate Division emphasized the thought that the intention to exercise a power was "not to be thwarted by refinements and distinctions resting upon subtlety and ingenuity or by lack of technical accuracy in the use of words or by unduly stressing the literal meaning of a few words or by attaching to them a hard and fast meaning which is not in consonance with the setting in which they were employed," quoting *Beals v. Magenis*, 307 *Mass.* 547, 31 *N. E. 2d* 20 (*Sup. Jud. Ct.* 1941).

In *Murphy v. Murphy,* 118 *N. J. Eq.* 108, 112–113 (*Ch.* 1935), affirmed *per curiam* 119 *N. J. Eq.* 83 (*E. & A.* 1935), where the decision turned upon finding the intention of the testator, the court admonished:

"The meaning and intention of the testator must be determined, not by fixing the attention on single words in the will, but by considering the entire will and the surroundings of the testator when he executed the will, and by ascribing to him, so far as his language permits, the common impulses of our nature. *Torrey v. Torrey,* 70 *N. J. L.* 672."

Ultimately, of course, each case must be determined upon its own facts and circumstances, but the fundamental purpose of the inquiry always remains. Our primary desire is to effectuate the wishes of the deceased if they are reasonably and lawfully discoverable and adequately proven.

Mary Martin Black raises a preliminary question concerning the *quantum* of proof needed to establish an intent to exercise a power of appointment, arguing that the standard exacted by the Chancery Division was unwarrantably high. In disposing of appellant's contention that the terms of the will and the circumstances surrounding testatrix when it was executed conjoined to reflect an intention to exercise, the lower court determined: "* * * it cannot be said that the circumstances are so clear that one must inevitably draw the conclusion that she intended to exercise the power," and concluded that "Singly and collectively they do not compel the conclusion that Mrs. Byrd exercised the power of appointment * * *."

Appellant insists the measures of "inevitability" and "compulsion" employed below are foreign to the field of will construction, where no such absolutes prevail, and urges that evidence making it "probable" or "clear" that Mrs. Byrd intended to appoint is sufficient. It is suggested by the opposing parties that this merely constitutes a quibble over semantics and that the quoted remarks actually signify the trial judge did nothing more than place the burden of persuasion upon Mrs. Black, where it properly belongs.

The efficacy of formulae postulating standards of proof is ofttimes the subject of cynical doubt, and, indeed, it must be conceded that no such formulations, with their somewhat subtle variations in language, can unequivocally insure that the weighing of evidence will proceed in a detached and objective fashion to a conclusion entirely dependent upon and completely consonant with the words used. But perfection is not to be hoped for, save by the most incurably optimistic, as long as the affairs of the world are dictated by men and, therefore, verbal devices for guiding the mind to a resolution of legal controversies cannot be condemned simply because they fall short of the ultimate to be desired. To a substantial degree, they serve to orient the factfinder in an objective manner toward his responsibilities and are valuable criteria for shaping his decision.

What degree of assuredness, then, must we have that the testatrix intended to appoint the fund in controversy to Mary Martin Black before we will effectuate such intention? Appellant refers us to numerous cases for the answer to this question, among them *Lippincott v. Stokes,* 6 *N. J. Eq.* 122 *(Ch.* 1847) ("clearly appear"); *Robeson v. Sholwell,* 55 *N. J. Eq.* 318 *(Ch.* 1897) ("satisfactorily"); *Lippincott v. Haviland, supra* ("appear in some form"); *Methodist Episcopal Home for Aged of New Jersey v. Tuthill,* 113 *N. J. Eq.* 460 *(Ch.* 1933) ("clearly show"); and *Board of Home Missions, etc. v. Saltmer,* 125 *N. J. Eq.* 33 *(Ch.* 1939) ("must clearly be shown" and "must not leave it uncertain"). These adjudications are not too helpful in this particular, however, because apparently the abstract issue of the *quantum* of evidence required to demonstrate sufficiently an intent to exercise a power of appointment was not specifically raised and argued in any of them.

We do not think it is necessary for the appellant to present so forceful and compelling a case that it is impossible to form a rational supposition contrary to her contention. The object of our investigation is to determine the probable intent of the testatrix by a preponderance of the evidence and to carry it out in accordance with her wishes even though

they be imperfectly expressed. We do what elemental justice and fundamental fairness demand under the necessitous circumstances. Mrs. Byrd's testament is final beyond reprieve. She cannot return to illuminate or to modify its terms. Therefore, we put ourselves in her position in so far as possible, endeavoring to accomplish what she would have done could she have envisioned the present inquiry. Certainties are seldom attainable in this realm, and probabilities should customarily be sufficient. See *Restatement, Property,* § 343, *comment (a).*

The conclusions expressed by Judge Clapp in his concurring opinion in *In re Klein's Estate, supra,* 32 *N. J. Super.* at *pages* 419–420, are applicable here, even though that case pertained to the implication of a conditional limitation upon a bequest. He said:

"The critical question in this case, as above stated, is what should be the standard of proof here. I think Lord Eldon's rule and the rule calling for clarity are too strongly stated. In my view the criterion should be simply probability; a provision should be implied if we are of the opinion that in all probability the testator actually intended that very provision. Such a standard produces a far more just result, than if we were to refuse to make any implication at all. We extend our efforts, as we ought, toward effectuating the testator's intentions. But—and this is the heart of the matter—the result reached does not, I think, do any violence to the overriding policies of the Statute of Wills which require the testator's intentions to be integrated into the paper propounded. For we derive a probability as to his designs from the very words on that paper.

The English cases seem to be opposed to these views. But it will be found upon an examination of the facts presented by cases in this country that a substantial number of authorities accept the more liberal position advanced here. 2 *Powell, Real Property* 710–713 (1950), and cumulative supplement. See the New York cases referred to in *Russell v. Russell,* 16 *N. J. Super.* 589, 595 *(App. Div.* 1951)."

A minority of jurisdictions, most notably Massachusetts, has held, even in the absence of a statute, that a general dispositive clause alone exercises a power of appointment, and one of the foremost authorities on future interests finds logic in this view. *Boston Safe Deposit & Trust Co. v. Painter,* 332 *Mass.* 362, 77 *N. E. 2d* 409 *(Sup. Jud. Ct.*

1948); *Amory v. Meredith,* 7 Allen, 89 *Mass.* 397 (*Sup. Jud. Ct.* 1863); *Simes, Future Interests* (*Handbook*), 208-209 (1951).

 Many states have enacted statutes accomplishing this same end. See *Restatement, Property,* § 343, *comment* (*d*) (1948 *supp.*). There is no danger of doing violence to the law of wills in holding that the intent to exercise a power of appointment need be proven only by a preponderance of the evidence which makes the existence of such an intent probable, and, in fact, all of the litigants so concede.

Respondents direct us to the classic statement of Mr. Justice Story that:

"Three classes of cases have been held to be sufficient demonstrations of an intended execution of a power: (1) Where there has been some reference in the will, or other instrument, to the power; (2) or a reference to the property, which is the subject, on which it is to be executed; (3) or, where the provision in the will or other instrument, executed by the donee of the power, would otherwise be ineffectual, or a mere nullity; in other words, it would have no operation, except as an execution of the power." *Blagge v. Miles,* 3 *Fed. Cas.,* pages 559, 566, *No.* 1,479 (1 *Cir.* 1841).

They argue that the case *sub judice* does not fall within any of the three categories enumerated in *Blagge* and that therefore the lower court was correct in concluding Mrs. Byrd had not exercised the power donated by her husband.

The fallacy of this reasoning lies in its assumed premise that Mr. Justice Story was attempting to describe all of the instances in which an intent to exercise could be found. The author of the opinion himself refuted this proposition, however, and only one or two later cases have considered the categorization above to be all-inclusive. See Annotation 91 *A. L. R.* 436 (1934). They failed to recognize that the basic endeavor is to ascertain the testator's intent and that the classification adopted in *Blagge* was only a synthesis of the fact patterns in earlier cases where the requisite intent had been found. As Mr. Justice Story further said:

"* * * for there is no pretense to say, that, because no other cases have as yet occurred, there can be no others. That would,

in fact, be to say, that the cases governed the general rule as to intention, and not the rule the cases. * * * On the contrary, if a case of clear intention should arise, although not falling within the predicament of these classes, it must be held, that the power is well executed, unless courts of justice are at liberty to overturn principles, instead of interpreting acts and intentions." *Blagge v. Miles, supra*, 3 *Fed. Cas.* at *pages* 566–567.

A multiplicity of considerations persuade us to the conclusion that Mrs. Byrd probably desired to appoint the trust fund for the benefit of her daughter.

It is undisputed that Mrs. Black enjoyed an extremely close and affectionate relationship with both her mother and stepfather. She had known William Byrd for some 40 to 50 years prior to his death. The existence of a gratifying rapport among these parties is persuasively demonstrated by the fact that the Byrds journeyed from New Jersey to Virginia on the day of their wedding to spend the first ten days of their married life with Mrs. Black in her home. After visiting a brother of Mrs. Byrd's, they returned to Warrenton for another stay before assuming permanent residence at Mr. Byrd's home in Short Hills.

This strong mutual esteem and devotion never waned and continued to flourish throughout the lives of William and Julia Byrd. Mary Martin Black was with her mother and William Byrd quite frequently. The Byrds and the Blacks invariably celebrated Christmas together, either in New Jersey or in Virginia. They jointly vacationed each summer in Edgerton, Massachusetts, where the Blacks had a cottage.

When her mother became ill, Mrs. Black stayed at the home in Short Hills for two months. Subsequently, Mrs. Byrd was removed to a hospital in New York, and Mrs. Black thereupon established a residence in that city, journeying back and forth to Short Hills with Mr. Byrd. She was also in attendance at Short Hills during the last illness of Mr. Byrd.

Following her husband's demise, Mrs. Byrd accompanied Mrs. Black to Edgerton, where they stayed until September of 1952. Then, Mrs. Byrd went to her daughter's home in

Virginia, where she spent the remainder of her life. Mrs. Black cared for her mother, who was almost 82 years of age when she died, and wrote all of Mrs. Byrd's correspondence since the latter was afflicted with palsy.

This close companionship, accompanied by constant and dedicated consideration, created a profound gratitude which deepened the natural maternal love of the mother for her only daughter. Incontrovertibly, Mary was the logical object of Mrs. Byrd's bounty.

Although it is asserted there is no proof the testatrix was cognizant of the contents of her husband's will, any reasonable hypothesis, we think, reflects quite definitely that she knew its provisions. When the sustaining head of a household departs this life, those who have been and still are dependent upon him naturally inquire as to their present financial status and the extent of the provisions made for them. Human nature prompts the inquiry; self-preservation stimulates it. Additionally and undisputedly, Mary was familiar with the terms of her stepfather's will, and it was she who suggested that her mother see a lawyer to have her own affairs put in order.

Surely, nothing yet revealed in these developments sustains the thought that Mrs. Byrd, as suggested below, willfully refrained from exercising the power of appointment in favor of the daughter who meant so much to her.

The purpose and pattern of Mr. Byrd's testamentary plan were logical, intelligent and lucid. He divided his estate into three parts. Two were given to his children and grandchildren; the other was placed in trust for his wife, she to receive the income therefrom during her life with unlimited power to invade the *corpus* if she so desired. If Mrs. Byrd predeceased her husband and daughter, Mrs. Black was to receive her mother's share. It is evident that the testator wanted one-third of his residuary estate to go to his wife's family.

In this setting, certainly Mrs. Byrd had no occasion to entertain compunctions about unfairly depriving William Byrd's own children of a portion of their father's estate.

It had been granted to her and her daughter. Testator was demonstrably fond of his stepdaughter since, in the event that Mrs. Byrd predeceased him, he placed Mary on an equal footing with his son and gave her more than his daughter.

Nor is it reasonable, by virtue of considerations pertaining to the independent financial status of herself or Mary Martin Black, to impute to Mrs. Byrd an inhibition against following the common human impulse. Her net estate, aside from the appointive fund, amounts to approximately $25,000. It is described by the respondents as "substantial and consequential" while the appellant terms it "inconsequential," signifying the importance which both sides attribute to its size as bearing upon the intent of the testatrix. When Mrs. Byrd's estate is compared with the sum subject to the power, one cannot logically deem it to be a legitimate surmise that the testatrix thought her daughter was amply provided for by the gift of $25,000 without the appointive property. Certainly the net worth of the estate flowing to Mary directly from her mother would have to be classified as small in comparison with the amount involved in the appointment. Moreover, Mrs. Black is not so affluent that it might deter her mother from appointing to her a fund containing over $300,000. The court below found that "Mrs. Black had received a fund which yielded her an income of $12,000 per year." This is not factually so. The fund was not hers; she merely received the income from a trust with no power of disposition over the *corpus*.

Mary and her mother were as close as human affection and esteem could bind them, and one searches in vain for a cause why, under these circumstances, without explanation, the mother, at the infirm age of 82 years, stricken with palsy and leaning more heavily upon her daughter for comfort and physical aid, should intentionally deprive her of the only sizable inheritance involved.

To the contrary, in sweeping language Julia Byrd endowed Mary Martin Black "with all my estate, both real and personal, or mixed, wheresoever situated, whether in

being or in expectancy * * *." Although she had the full power and authority to withdraw the whole or any part of the capital of the trust in question, she never reduced it to possession or converted it to her enjoyment. Could the fund as it thus existed be termed or regarded by her as an expectancy? Regardless of the strict legalistic definition of the phrase, the possibility that she used it to refer to the trust fund contributes something to the composite of various factors ultimately portraying the testatrix' intention.

The scrivener of Mrs. Byrd's will was a Virginia lawyer located in Warrenton. He drew the residuary clause, which by Virginia statute was sufficient to execute the power donated to the testatrix. The rule that the law of the donor's domicile governs the determination of whether the donee of a power intended to exercise it, despite the fact that the donee has a different domicile, is, to say the least, abstruse. It is said by some authorities to run contrary to legitimate expectation and has been condemned as illogical. *Goodrich, Conflict of Laws,* § 177 (1949); 2 *Beale, Conflict of Laws,* § 288.1 (1935); 5 *American Law of Property,* § 23.3 (1952). Withholding our judgment on the merits of this controversy over which is the more seemly choice of the law, it is enough to say that we can appreciate, at least in part, why a Virginia lawyer might regard the residuary clause in question as fully complying with Mrs. Byrd's desire to exercise her power of appointment in favor of her daughter.

Then, too, we are mindful of the plausible inferences to be drawn from the terms of Mrs. Byrd's contingent gift to the Macy grandchildren in the event Mrs. Black should predecease her. She specifically requested these grandsons "to equally share the responsibility of the care and maintenance of AUBREY HENRY MARTIN, JR." He is another grandson of the testatrix and is mentally retarded as a result of a forceps injury suffered at birth. His father does not contribute to his support and his mother is confined to a mental institution. During his formative years, he was sent to various schools for special training at the

expense of Mrs. Byrd. His aunt, Mrs. Black, shared the responsibility of his care, and he lived with her during vacation periods. Since he has become of age, he has worked erratically at various positions and for a time was an usher in a movie theater. Because of his physical and mental difficulties, he is not self-supporting, and previous to her death Mrs. Byrd regularly gave him for his maintenance as much as $1,200 a year even when he was employed.

Considering Mrs. Byrd's obvious solicitude for the welfare of her unfortunate and handicapped grandchild, who was only 18 years of age when her will was executed and had a probable life expectancy of 40 to 50 years, and interested as she was in the future security and maintenance of Aubrey, is it reasonable to assume she would leave only $25,000 from which this could be accomplished when she had a fund of over $300,000 at her disposal?

The history and past experience of the family's existence demonstrate beyond doubt that she could trust her daughter Mary to care for Aubrey since Mary had already, in part, assumed that obligation, but in the event her daughter predeceased her, she cautiously inserted the precatory request in the will as to the joint responsibility of the other grandsons to assume this burden. $25,000 would hardly be sufficient to support Aubrey comfortably with the things which he required for the rest of his life, and his cousins could not be expected, because they were all young men, to supply his wants from their personal resources. Mrs. Byrd surely wanted the Macys also to have some financial benefit from her gift after the moral obligation to Aubrey had been discharged, and a reasonable inference is that she intended to dispose of the trust fund through her testamentary bequest.

It may well be that none of the incidents related above is adequate in and of itself to prove the required intention. Yet the combination of all the circumstances in their aggregate, as they integrate with one another and reflect upon the problem as a whole, is sufficient to sustain the appellant's burden of proof in the case *sub judice*.

██ Essential justice does not permit "a discernible intention of the testator" to be defeated. The *quantum* of proof may be supplied by logical inferences if they are sufficiently persuasive to carry the necessary conviction. We accordingly, from the whole record, conclude that Mrs. Byrd intended to and did appoint the trust fund to her daughter.

The judgment below is reversed and the cause is remanded for further proceedings consistent with the views expressed in this opinion.

HEHER, J. (dissenting). I concur in the judgment of Judge Price.

The rationale of the majority's opinion is that in New Jersey a residuary or general devise of real or personal estate does not in itself operate as an execution of a power of appointment; that "[t]he testator must in some way express or indicate a conscious intention to execute it" and an existing intention, imperfectly expressed, may be "aided and supported by surrounding circumstances and their reasonable and logical implications," and here "[a] multiplicity of considerations persuade us to the conclusion that Mrs. Byrd probably desired to appoint the trust fund for the benefit of her daughter."

An intention may be imperfectly expressed, or not expressed at all, or there may have been no plan or design forming an intention to do or not to do a particular thing. And I hold the view that the will reveals no intent or purpose to execute the power of appointment, and to draw upon the cited extraneous circumstances as indicative of such an affirmative design by implication of fact is to ascribe a new testamentary disposition to the testatrix by parole evidence in disregard of basic law.

It is elementary principle in the construction of wills that the controlling consideration is the effect of the words as actually written rather than the actual intention of the testator independently of the written words; the question is not what the testator in fact intended, or what he was minded to say, but rather the meaning of the terms chosen

to state the testamentary purpose, and all the rules of construction and the use of extrinsic evidence are merely in aid of the fulfillment of the intention reasonably comprehended in the words; the words are to be assessed in the light of the surrounding facts and circumstances; the extrinsic evidence is to enable the judicial interpretive authority the better to discover the true sense of the words, and to uncover and resolve ambiguity, but not to import into the will an intention alien to the expression. *In re Armour's Estate*, 11 *N. J.* 257 (1953).

While there is a presumption against partial intestacy, it is nevertheless the rule that "where there is a deficiency in a will the court may not amplify or enlarge it to supply a provision to express the supposed intention of the testator." *Guaranty Trust Co. of New York v. First National Iron Bank of Morristown*, 8 *N. J.* 112 (1951). If the "legal effect of [the testator's] expressed intent is intestacy, it will be presumed that he designed that intent since he is presumed to know the law." *Lawes v. Lynch*, 6 *N. J.* 1 (1950).

Intention is the basic postulate of a construction affirming the execution of the power. Its execution depends upon the "intention to execute it, which intention must be found in [the] will either by express terms or by necessary implication; it is sufficient evidence of such intention, however, if the will shows that the donee had in view the subject of the power, and for this purpose extrinsic evidence of [the testator's] circumstances at the time of the execution [the] will is admissible," *Camden Safe Deposit & Trust Co. v. Fitler*, 123 *N. J. Eq.* 245 (*Ch.* 1938), affirmed *Camden Safe Deposit & Trust Co. v. Frishmuth*, 125 *N. J. Eq.* 169 (*E. & A.* 1939). And conjecture alone will not sustain a finding of an intention to execute the power. *Guaranty Trust Co. of New York v. First National Iron Bank of Morristown, supra.*

I do not find in the circumstances here a sufficient basis for the finding that the testatrix had in view the subject of the power and intended to exercise it in the execution of

her will, "as that the will includes something the testatrix did not have, otherwise than under the power, or that part of the will would be inoperative unless applied to the power." *Lippincott v. Haviland,* 93 *N. J. Eq.* 585 (*Ch.* 1922). See also *Farnum v. Pennsylvania Co.,* 87 *N. J. Eq.* 108 (*Ch.* 1916), affirmed 87 *N. J. Eq.* 652 (*E. & A.* 1917). Nor would the provision in the will "otherwise be ineffectual, or a mere nullity; in other words [have] no operation, except as an execution of the power." *Blagge v. Miles,* 3 *Fed. Cas.,* pages 559, 566, No. 1479, 1 *Story* 426, 446, 447, 4 *Law Rep.* 256 (1 *Cir.* 1841). Compare, *Meeker v. Breintnall,* 38 *N. J. Eq.* 345 (*Ch.* 1884); *Wooster v. Cooper,* 59 *N. J. Eq.* 204 (*Ch.* 1900); *Paul v. Paul,* 99 *N. J. Eq.* 498 (*Ch.* 1926); *Pennsylvania Co. etc. v. Morrell,* 108 *N. J. Eq.* 188 (*Ch.* 1931); *Lee v. Simpson,* 134 *U. S.* 572, 10 *S. Ct.* 631, 33 *L. Ed.* 1038 (1889); *Reeside v. Annex Bldg. Ass'n,* 165 *Md.* 200, 167 *A.* 72, 91 *A. L. R.* 426 (*Ct. App.* 1933).

It is of no significance that the draftsman of the donee's will was a practitioner of the law in Virginia, where, it is said, the rule is that the residuary clause of the will would operate as an execution of the power. The draftsman was not called as a witness; and there was no testimony from him or from any other source that the donee had this local rule of law in mind and had deemed the will an execution of the power, assuming that evidence of an obvious parole extension of the will would have been admissible, an untenable proposition. There is no basis whatever for this hypothesis.

The deceased donor, Byrd, was a lawyer of eminence in his profession, domiciled in New Jersey at the time of the making of his will, and long before; and he well knew the New Jersey requirement that there be an affirmative execution of the power to appoint, and that a general or residuary devise or bequest would not suffice. Although he did devise and bequeath the subject property to his stepdaughter, Mary Martin Black, in the event his wife predeceased him, he did not provide for an estate in remainder to his stepdaughter

upon the termination of the equitable life estate given to his wife, but he gave to his wife, if she survived him, the power to use the principal as well, and directed the trustee "to pay the principal as his wife shall appoint by her last will and testament." It is also to be presumed that he intended that the appointment be made as ordained by the law of his domicile, and that he was aware a failure of appointment would give rise to intestacy. And it goes without saying that the donee's intention to execute the power must be clear and manifest; such is an attribute, the very essence, of the New Jersey rule. Compare *Wooster v. Cooper, supra.*

And I am in accord with the conclusion below that *N. J. S.* 3*A*:3–14 is not applicable. The case is not within the letter or spirit of the act.

I would affirm the judgment.

*For reversal*—Chief Justice WEINTRAUB, and Justices WACHENFELD, BURLING, JACOBS, FRANCIS and PROCTOR—6.

*For affirmance*—Justice HEHER—1.