859 A.2d 700

IN THE MATTER OF THE ESTATE OF SARKIS GABRELLIAN, DECEASED.

Superior Court of New Jersey
Appellate Division

Argued September 20, 2004—Decided October 20, 2004.

434

Before Judges PETRELLA, LINTNER and YANNOTTI.

*Joseph B. Fiorenzo,* argued the cause for appellant Mark Gabrellian (*Sokol, Behot & Fiorenzo,* attorneys; *Mr. Fiorenzo,* of counsel and on the brief; *Steven Siegel,* also on the brief).

*Gerard G. Brew,* argued the cause for respondent Siran Gabrellian (*McCarter & English,* attorneys; *Mr. Brew,* of counsel and on the brief; *Alison C. O'Sullivan,* also on the brief).

The opinion of the court was delivered by

PETRELLA, P.J.A.D.

In this estate and family dispute between a son, Mark Gabrellian (appellant or Mark), and his mother, Siran Gabrellian (respondent or Siran), Mark appeals from the grant of summary judgment dismissing his verified complaint. His claim for declaratory judgment was based on an assertion of the probable intent of the testator, Sarkis Gabrellian (testator), his father, regarding continuation of the testator's substantial real estate development businesses. In his 1983 Will, the testator named Siran and Mark as co-executors and his wife as his primary beneficiary.

After his father's death in 1998, Mark instituted an action in the Chancery Division to probate the testator's 1983 Will together with a separate writing (Writing) signed by the testator and witnessed by his close friend and Siran. The Writing indicated that certain payments were to be made to a number of charitable beneficiaries and to his two grandchildren. A dispute arose over the funding of these gifts, which amounted to about $25 million as set forth in the Writing. A settlement was reached between Mark and Siran with court orders entered on July 29, 1999, May 6, 2002, and September 18, 2002. The first probate action was dismissed with prejudice, and the terms of the settlement were memorialized. Pursuant to the latter order, the testator's Will, along with the Writing, which had been proffered for probate by Mark in his verified complaint, were admitted to probate. The September 18, 2002 order also confirmed the appointments of Siran and Mark as co-executors.

On October 4, 2002, Mark initiated a second probate action, which sought a declaration that the testator's probable intent required the co-executors to continue to operate the testator's businesses with Mark as manager until Mark and his mother

agreed to sell it.[1] Siran's sole right to the net income derived from the continued operation of the businesses was not contested. The complaint also sought a declaration that upon Siran's death the ownership of the remaining business entities would be transferred to Mark. In the meantime, it sought declarations that Mark had continuing authority to do whatever was necessary in the operation of the testator's businesses and that the Will was intended to create a trust with Mark and Siran as trustees to hold the assets constituting what had been his father's businesses to accomplish the foregoing. The Chancery Judge rejected all of these claims on various grounds.

On appeal from the dismissal of his second probate action Mark argues the judge erred: (1) in granting Siran's motion for summary judgment because there were material fact issues concerning the testator's probable intent regarding his businesses; (2) in concluding the Will is "clear on its face"; (3) by misapplying the standard for considering the doctrine of probable intent and failing to consider extrinsic evidence; (4) in construing the Will as if it were a commercial contract; (5) in applying equitable principles to bar his second cause of action; and (6) in applying concepts such as the entire controversy doctrine, res judicata and judicial estoppel.

The testator was apparently diagnosed with terminal lymphoma around 1992. Mark went to law school in California, obtaining his J.D. degree in 1983, and practiced law there for a short time before moving to Washington, D.C. He was also admitted to the practice of law in New Jersey and moved here in 1996, assertedly to assist in running his father's successful real estate development business consisting of various limited partnerships and corporations, including a mall in Paramus. Mark began to take a more

---

[1] After filing a second complaint, Mark moved for reconsideration, seeking to have the Writing withdrawn from probate. That motion was denied by the trial court in an order dated December 13, 2002.

active part in the operation of the businesses as his father's illness progressed.

The testator died on September 16, 1998. Under the testator's 1983 Will his wife, Siran, was given all non-business tangible property, and if Siran predeceased Mark, then everything would pass to Mark. The Will then divided the residuary estate into two parts and bequeathed the amount exempt from the United States federal estate tax, $625,000 at the time of testator's death, to Mark and the entire remaining residuary estate, consisting essentially of the business assets then valued at well over one hundred million dollars, to his wife.

Article Ninth of the Will addresses the continuation of testator's businesses as follows:

> If at the time of my death, I am the owner of any business, whether as a sole proprietor, partner, or holder of more than ten (10%) per cent of the outstanding stock, I hereby authorize my Executors and Trustees to exercise all powers with respect to such business which I could exercise if present and acting. This shall include but not by way of limitation, the power to name or change officers, directors or employees, to act as an officer, director or employee themselves, and the power to expend [sic], limit, alter or reconstitute such business in any way they deem advisable. I hope it will be possible for my Executors and Trustees to continue any business, which I am engaged in, but such decision shall rest in their sole and absolute discretion. If any business which I am engaged in at the time of my death is retained or continued by my Executors and Trustees, they shall in no way be liable for any loss resulting from such retention and continuance, or from the operation of such business, except where such loss is the result of misconduct or gross negligence.

In addition to the Will, the Writing, which is said to have been dictated by Sarkis to his close friend, Harold Azmelian, was signed by Sarkis and witnessed by his wife and Azmelian on September 13, 1998. The Writing listed various charitable distributions aggregating some $19 million and gifts to his two grandchildren amounting to several million dollars payable at ages 25, 30 and 35. The Writing makes no mention of Mark and includes statements directing "Everything to Siran" and "Sell all holdings immediately."

Whether the Writing could qualify as a codicil to the 1983 Will was never decided. By the settlement, the parties gave effect to

the Writing and it was subsequently probated with the Will as part of the settlement.

Following his father's death and through the first probate action, Mark continued to run the businesses. At some point he took the position that despite his mother being a co-executor and owning all of the stock of the businesses, the estate remains open in a sense because he claims to be entitled to continue running the businesses, presumably as the other co-executor with his mother. This is notwithstanding Mark's continued acknowledgements that all of the assets after paying him the federal tax credit amount of $625,000 belong to his mother, and that ultimate disposition of the business assets is up to her.

As noted, the Chancery Judge summarily dismissed the probable intent claim and held that all issues in the second cause of action should have been raised in the first probate action, and therefore, a number of preclusion doctrines required dismissal of the complaint.

I.

Mark contends that summary judgment was improper because there were material issues of fact regarding the probable intent of the testator. *R.* 4:46–2. *See also Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 540, 666 *A.*2d 146, 156 (1995). Mark argues that the Will is not clear on its face, and even if it could be deemed clear on its face, the judge erroneously failed to consider extrinsic evidence.

Mark maintains that he moved from Washington, D.C. to New Jersey at his father's request to assist in the management of the businesses and this establishes that his father would not have wanted the businesses to be liquidated. He further argues that the "sell all holdings immediately" language is inconsistent with Article Ninth of the Will and fails to express his father's true

intent.[2]

In attempting to determine the probable intent of the testator, where that doctrine applies, courts must consider the entirety of the will in light of the circumstances surrounding the execution of the will. *In re Estate of Branigan*, 129 *N.J.* 324, 332–333, 609 *A.*2d 431, 436 (1992) (*quoting Fidelity Union Trust Co. v. Robert*, 36 *N.J.* 561, 564–565, 178 *A.*2d 185, 187 (1962)). Therefore, courts endeavor to put themselves in the testator's position to attempt "to accomplish what he would have done had he 'envisioned the present inquiry.'" *Fidelity Union Trust, supra* (36 *N.J.* at 565–566, 178 *A.*2d at 187) (*quoting Bank of New York v. Black*, 26 *N.J.* 276, 287, 139 *A.*2d 393, 398 (1958)). Applying probable intent can be a slippery slope. Obviously, it is not for the court to determine what a judge would have written if originally drafting the instrument.

In applying probable intent, extrinsic evidence may be reviewed. However, *Wilson v. Flowers*, 58 *N.J.* 250, 263, 277 *A.*2d 199, 207 (1971), restricted the breadth of extrinsic evidence:

> We do not, of course, mean to imply that such evidence (extrinsic) can be used to vary the terms of the will, but rather that it should be admitted first to show if there is an ambiguity and second, if one exists, to shed light on the testator's actual intent.

It is clear that the concept of presumed probable intent must be applied sparingly and only where necessary to give effect to the intent of the will or trust without varying the terms of the document. *In re Munger's Estate*, 63 *N.J.* 514, 521, 309 *A.*2d 205, 208–209 (1973); *In the Matter of the Estate of Baker*, 297 *N.J.Super.* 203, 209, 687 *A.*2d 1047, 1050 (App.Div.1997). The doctrine of probable intent cannot be used to "conjure up an interpretation or derive a missing testamentary provision out of whole cloth." *In re Estate of Burke*, 48 *N.J.* 50, 64, 222 *A.*2d 273, 280 (1966). It cannot be used to write a will that the testator did not write. *In re Estate of Cook*, 44 *N.J.* 1, 12, 206 *A.*2d 865, 871 (1965). In that

---

[2] It does not appear inconsistent, however, with the residuary bequests.

case, the Court warned that the "overriding policy of the Statute of Wills prevents filling obvious gaps or changing clear provisions." *Ibid.*

Where the doctrine has been used it has been done only with caution and to clarify ambiguities in a will, usually where an unforeseen contingency occurred which might have resulted in unexpected intestacies, *Estate of Burke, supra,* 48 *N.J.* at 64–65, 222 *A.*2d at 280–281; *Engle v. Siegel,* 74 *N.J.* 287, 377 *A.*2d 892 (1977) (will did not address death of primary legatee before decedent's death); or to achieve certain tax advantages without substantive changes in any substantive provisions of a will or trust. *Branigan, supra,* 129 *N.J.* at 336, 609 *A.*2d at 437–438. Thus, in *Branigan,* certain non-testamentary aspects of the will were reformed to obtain tax savings, but only to the extent that those revisions did not alter the dispository provisions of the will. *Id.* at 336–337, 609 *A.*2d at 437–438; *see also In re Estate of Ericson,* 74 *N.J.* 300, 377 *A.*2d 898 (1977).

In *Wilson, supra,* 58 *N.J.* at 257–258, 277 *A.*2d at 203–204, probable intent was used to avoid a partial intestacy by equating the word "philanthropic" with the word "charitable" in construing the will because of a "strong presumption that testators did not intend to die intestate." Likewise, in *Fidelity Union Trust, supra* (36 *N.J.* at 568, 178 *A.*2d at 189), the Court applied probable intent to correct a partial intestacy caused by an unforeseen contingency.

In *In re Estate of Tateo,* 338 *N.J.Super.* 121, 128–130, 768 *A.*2d 243, 247–248 (App.Div.), *certif. denied,* 168 *N.J.* 295, 773 *A.*2d 1158 (2001), the court resorted to extrinsic evidence to enforce a specific pre-residuary bequest where the estate contained insufficient assets to make such a bequest. However, *Tateo* did not create a bequest from "whole cloth." Rather, it merely addressed a situation where the estate assets were insufficient to fund all bequests. Where, as here, a will is clear and unambiguous on its face there is no place for invocation of the probable intent doctrine.

The doctrine of probable intent is not applicable where the documents are clear on their face and there is no failure of any bequest or provision. The Will and the Writing signed by the testator, even if viewed together, do not create an ambiguity. The probated Will indicates the testator's intent that his wife receive his entire residuary estate, including the businesses, and the Writing reiterates his intent that "everything" was to pass to Siran. Under either document, or both of them, Siran was the primary beneficiary with full entitlement to all of the assets. As residuary beneficiary entitled to the entire balance of the estate after the payments provided for in the Writing, Siran would be uncontrovertibly entitled to complete ownership and right of disposition of the businesses owned by the testator.

There is nothing to support Mark's claim, particularly in light of the unambiguous bequests, to retain control of his father's businesses.

At oral argument we could not get a clear statement as to whether the estate was concluded, because of a reservation that it was subject to Mark's alleged continuing right to run the various businesses. However, Mark has no such continuing right. Although the testator stated in his 1983 Will that the co-executors have the power to operate any businesses he owned at his death in any manner they see fit, this authority was given to Mark only in his role as co-executor along with his mother, a co-executor. Following conclusion of the estate, Mark's role in the businesses, if any, is up to Siran alone. There remain no issues preventing the conclusion of this estate, and thus, it should be concluded "as soon as possible" as contemplated by the parties in their previous settlement agreement.

Thus, the Chancery Judge appropriately dismissed the case because there was no genuine issue of material fact.

## II.

In the alternative, the Chancery Judge properly held that Mark was precluded from bringing this challenge to Siran's

claims of entitlement. The judge correctly applied the entire controversy doctrine to preclude Mark's claims. The entire controversy doctrine requires the assertion of all claims arising from a single controversy in a single action at the risk of being precluded from asserting them in the future. *R.* 4:30A; *Prevratil v. Mohr,* 145 *N.J.* 180, 190, 678 *A.*2d 243, 248 (1996). The purposes of the entire controversy doctrine are: "(1) the need for complete and final disposition through the avoidance of piecemeal decisions; (2) fairness to parties to the action and those with a material interest in the action; and (3) efficiency and the avoidance of waste and the reduction of delay." *DiTrolio v. Antiles,* 142 *N.J.* 253, 267, 662 *A.*2d 494, 502 (1995).

The entire controversy doctrine applies to successive suits with related claims. *DiTrolio, supra,* 142 *N.J.* at 268, 662 *A.*2d at 502–503; *Kaselaan & D'Angelo Assocs. Inc. v. Soffian,* 290 *N.J.Super.* 293, 299, 675 *A.*2d 705, 708 (App.Div.1996). It is "the factual circumstances giving rise to the controversy itself, rather than the commonality of claims, issues or parties, that triggers the requirement of joinder to create a cohesive and complete litigation." *Mystic Isle Dev. Corp. v. Perskie & Nehmad,* 142 *N.J.* 310, 322, 662 *A.*2d 523, 529 (1995). *See also Prevratil, supra,* 145 *N.J.* at 187–190, 678 *A.*2d at 246–248. The doctrine, however, does not bar claims that were unknown during the time of the original action. *Mystic Isle, supra,* 142 *N.J.* at 322, 662 *A.*2d at 529.

Here, the claims in the second probate action filed by Mark in 2002 were based on facts not only known to him at the time he filed the 1999 litigation, but which arise from a single controversy regarding the testator's probable intent with respect to the disposition of his businesses. The very issue of probable intent was referred to in Mark's 1999 verified complaint, where he stated in pertinent part:

> An evidentiary hearing is necessary in order to resolve all issues surrounding the Writing, including Decedent's *probable intent* and his understanding of the terms of the Writing. (emphasis added).

Mark's first complaint also raised issues regarding the need to continue the businesses by administrators or the co-executors.

Mark's claim that the first action had not been completed before the filing of the second complaint is without merit. Mark filed the second probate action on October 4, 2002, after the judge had entered a dispositive order on September 18, 2002, in the first probate action, but before his motion for reconsideration was filed in the first action on October 7, 2002. Mark contends that the action was still undecided because the motion for reconsideration was not decided until December 13, 2002. Regardless of when the motion for reconsideration seeking to remove the Writing from probate was filed or decided, it did not affect the viability of the first order. A final order in the first probate matter was in effect as of September 18, 2002.

Furthermore, even if Siran did not inform her son of her intention to liquidate the family businesses until after the first action was complete, Mark was on notice of a potential sale of the businesses. The Writing signed by his father clearly stated, "Sell all holdings immediately." Indeed, Mark's verified complaint filed in the first action recites in pertinent part:

14. Lastly, the writing appears to indicate, "Sell all holdings immediately."

* * *

34. If the writing is construed as a directional, and the Will admitted to Probate, Mrs. Gabrellian, or entities owned or controlled by Decedent, shall follow the Decedent's directions by:

* * *

C. The Executors shall liquidate sufficient assets to satisfy these instructions; to pay the unified credit amount under paragraph Fourth (a) of the Will; and shall distribute the balance of the Estate assets to Mrs. Gabrellian in kind.

Moreover, during the pendency of the first probate action Mark wrote in a letter to the limited partners of the businesses dated April 3, 2000, that his mother was thinking of selling the businesses, indicating his awareness of that potential occurrence. In that letter, he stated:

Since my father's death, there has been some talk of possibly selling the business, but when I have tried to engage my mother in discussions regarding her intentions

toward the business she has refused to talk to me about them, leaving me as much in the dark as to the long term outlook for Gabrellian Associates as you are.

Mark's statements reveal his full awareness that the issues raised in his present complaint not only existed during the first action, but in fact caused him concern. His failure to raise them earlier precluded him from later raising them.

Mark argues that it was an abuse of discretion for the judge to apply the entire controversy doctrine because the "particularized facts" of this action and the equities at stake bar application of the doctrine. The judge set forth the facts relied on in both causes of action and concluded that the second probate action was based on the underlying facts of the first probate action. Thus, the judge concluded that the claims should have been raised in the first probate action. The judge's decision was correct and promoted the three-fold purpose of the entire controversy doctrine. The doctrine clearly applies to two successive, contested probate actions that were unquestionably intertwined. Accordingly, the Chancery Judge correctly applied the entire controversy doctrine when dismissing Mark's second probate action.

The judge also correctly applied res judicata to bar Mark's claims. Res judicata, as do the other issue preclusion concepts, has the salutary purpose of preventing re-litigation of the same controversy between the same parties. *Brookshire Equities, LLC v. Montaquiza*, 346 *N.J.Super.* 310, 318, 787 *A.*2d 942, 946–947 (App.Div.), *certif. denied*, 172 *N.J.* 179, 796 *A.*2d 895 (2002). "In order for *res judicata* to apply, there must be (1) a final judgment by a court of competent jurisdiction, (2) identity of issues, (3) identity of parties, and (4) identity of the cause of action." *Ibid.* Mark contends that only the third element is present in this case, making the doctrine inapplicable. He argues that there was no final judgment when the second probate action was filed and that the issues and cause of action are not the same because the first probate action related to the probate of the Will, the appointment of executors, and the distribution of gifts, while

the second probate action addressed the continued operation of the family businesses.

We reject Mark's argument that a settlement bars applicability of res judicata principles. The parties settled the charitable gift aspect and the gifts to testator's grandchildren, and a final order was entered incorporating the settlement and admitting the Will and the Writing to probate. It is well established that "a judgment of involuntary dismissal or a dismissal with prejudice constitutes adjudication on the merits 'as fully and completely as if the order had been entered after trial.'" *Velasquez v. Franz*, 123 *N.J.* 498, 507, 589 *A.*2d 143, 148 (1991). Thus, the order dismissing the 1999 litigation with prejudice constituted an adjudication on the merits, and invoked elements of res judicata, collateral estoppel and judicial estoppel.

Additionally, the issues and causes of action are essentially the same, namely the interpretation of the Will and the Writing. Both actions sought determinations of the effect to be given to the Will and the Writing. The judge in the first action admitted both the Will and the Writing to probate, and, therefore, Mark's attempts to re-interpret those documents in the second probate action were nothing more than an attempt to re-litigate the first probate action. The facts supporting the action and relief were the same, and thus, the claims could and should have been raised in the first action. Thus, res judicata also barred Mark from bringing the second probate action.

Based on our conclusion that Mark's claims were barred by the entire controversy doctrine and res judicata we need not consider whether the additional equitable doctrines cited by the Chancery Judge also serve to bar these claims.

Affirmed.