678 A.2d 243

JOSEPH PREVRATIL AND LISA PREVRATIL, HIS WIFE, PLAIN-
TIFFS–APPELLANTS, v. GEORGE MOHR AND RICH HILL,
TRANSPORTATION, DEFENDANTS–RESPONDENTS.

Argued November 28, 1995—Decided July 10, 1996.

*Kenneth S. Javerbaum* argued the cause for appellants (*Javerbaum Wurgaft & Hicks*, attorneys; *Mr. Javerbaum* and *Eric G. Kahn*, on the brief).

*Modestino Carbone* argued the cause for respondents (*McDonald, Nathan & Carbone*, attorneys).

The opinion of the Court was delivered by

POLLOCK, J.

The primary issue is whether we should create an exception from the entire controversy doctrine for automobile-negligence cases. Specifically, the question is whether the entire controversy doctrine bars the personal injury action of plaintiffs, Joseph

Prevratil, and his wife, Lisa, when counsel for his employer's insurer defended Prevratil and the employer in a prior action arising out of the same automobile accident as gives rise to Prevratil's present action.

The Law Division granted the motion for summary judgment by defendants George Mohr and Rich Hill, holding that the doctrine barred plaintiffs' claims. The Appellate Division affirmed, 279 *N.J.Super.* 652, 653 *A*.2d 1190 (1995). We granted Prevratil's petition for certification, 141 *N.J.* 97, 660 *A*.2d 1196 (1995), and now reverse and remand the matter to the Law Division.

We hold that the entire controversy doctrine applies to actions arising out of automobile-accident cases. Likewise, litigants currently involved in negligence litigation shall have time to make a timely application to assert affirmative claims. In all other cases, litigants in an automobile-accident case must assert any affirmative claims in the course of a single litigation.

-I-

This action arises from a three-vehicle accident on March 2, 1989. Prevratil was operating a vehicle owned by his employer, Benjo Trucking Company (Benjo), and insured by Royal Insurance. Defendant, George Mohr, was operating a vehicle owned by his employer, Rich Hill Transportation (Rich Hill), and Janet Olsen was operating her own vehicle. The vehicles were proceeding on State Highway 440 in Woodbridge: Mohr, Prevratil, and Olsen. Mohr drove his vehicle into the rear of Prevratil's truck, which then struck Olsen's vehicle.

Olsen filed a personal injury action on May 2, 1989, naming as defendants Prevratil, Mohr, Benjo, and Rich Hill. Olsen's counsel served a summons and complaint on Prevratil at his residence, 51–24 35th Street, Long Island City, New York, by both regular and certified mail. Although Prevratil claimed that he never had received any notice of the suit, someone signed his name on the certified-mail return-receipt card.

Benjo's insurer retained the law firm of Crowley & Cross to represent Prevratil and Benjo. On June 23, 1989, the firm filed an answer and cross-claim for contribution on Prevratil's behalf. The answer did not assert any cross-claims or counterclaims for personal injuries to Prevratil.

Olsen settled her suit within seven months of filing. In a release and stipulation of dismissal with prejudice executed on December 4, 1989, Olsen settled her claims against Mohr and Rich Hill for $15,000. She dismissed her claims against Prevratil and Benjo.

On November 26, 1990, Prevratil filed the present action against Mohr and Rich Hill (subsequently described as defendants). Defendants moved for summary judgment on the ground that Prevratil should have asserted his personal injury claims in the Olsen action. Prevratil countered that he was unaware of the pendency of the Olsen action or Crowley & Cross's appearance in that action on his behalf.

The trial court reasoned that the application of the entire controversy doctrine turned on whether Prevratil actually knew about the Olsen action before its resolution. Consequently, the court conducted a plenary hearing on July 12, 1993, on that issue. *See Cafferata v. Peyser,* 251 *N.J.Super.* 256, 260, 597 *A.*2d 1101 (App.Div.1991) (requiring evidential hearing when plaintiff's knowledge of initial suit is disputed); *Madison Indus. v. Eastman Kodak,* 243 *N.J.Super.* 578, 585, 581 *A.*2d 85 (App.Div.1990) (affirming fact-finding hearing to resolve summary judgment on intent of parties). The purpose of the hearing was to conduct limited fact-finding before ruling on the motion for summary judgment. The procedure is eminently sensible. If a court can determine a matter on summary judgment by recourse to limited fact-finding, a plenary trial on all issues is inefficient and unnecessary.

At the hearing, defendants contended that Prevratil's answer to Olsen's complaint, filed on Prevratil's behalf by Crowley & Cross, showed that Prevratil had been properly served. Defendants

submitted correspondence from Patrick W. Foley, Olsen's attorney, to Crowley & Cross after it filed Prevratil's answer. The letter stated that Foley had been unable to serve Benjo. Defendants reasoned that Prevratil must have received the complaint and forwarded it to Benjo, who then forwarded it to Royal Insurance, which finally forwarded it to Crowley & Cross. Otherwise, Crowley & Cross would not have filed Prevratil's answer to the complaint. Prevratil countered that the omission of an answer on behalf of Benjo was a mere oversight.

To substantiate that Prevratil had been served with the Olsen complaint, defendants introduced the certified-mail return-receipt card bearing Prevratil's signature. The complaint had been sent by regular and certified mail to Prevratil's residence in Long Island City. Neither the complaint nor any other correspondence regarding the Olsen action sent by Foley or by Crowley & Cross to Prevratil had been returned as undelivered. Prevratil conceded that he had received other official documents, such as tax returns and workers' compensation checks, at his Long Island City residence. He denied, however, that the signature on the receipt card was his and explained that a neighbor might have signed his name.

The trial court concluded that Prevratil had timely knowledge of the Olsen litigation. The proofs also revealed that shortly after the accident Prevratil knew of his alleged injuries. Three months after the accident, Prevratil consulted his personal attorney about filing an action for personal injuries arising out of the accident. While the Olsen action was pending, moreover, Prevratil consulted an attorney about filing a workers' compensation claim for the same injuries. Finding no special equities justifying an exception to the entire controversy doctrine, the trial court granted defendants' motion for summary judgment.

Prevratil appealed to the Appellate Division. While the appeal was pending, another part of the Appellate Division permitted a plaintiff in a multi-vehicle accident case to pursue a personal injury claim despite plaintiff's failure to assert an affirmative claim in prior related litigation. *Stebbins v. Robbins*, 278 *N.J.Super.*

439, 651 *A.*2d 486 (1995). In the present case, however, the Appellate Division affirmed the summary judgment dismissing Prevratil's complaint. It ruled that absent equitable considerations, automobile-negligence cases should remain subject to the joinder-of-claims requirements of the entire controversy doctrine as contained in *Rule* 4:30A. 279 *N.J.Super.* at 657, 653 *A.*2d 1190.

We granted Prevratil's petition for certification to resolve the conflict in the Appellate Division decisions. We agree that automobile-accident cases should be subject to the rules pertaining to the mandatory joinder of claims, *Rule* 4:27, and to the entire controversy doctrine, *Rule* 4:30A. To assure the fairness of the dismissal of Prevratil's action, however, we reverse the judgment of the Appellate Division and remand the matter to the Law Division.

-II-

*Rule* 4:30A   states:

Non-joinder of claims or parties required to be joined by the entire controversy doctrine shall result in the preclusion of the omitted claims to the extent required by the entire controversy doctrine, except as otherwise provided by *R.* 4:64–5 (foreclosure actions) and *R.* 4:67–4(a) (leave required for counterclaims or cross-claims in summary actions).

*See also R.* 4:7 (making mandatory counterclaims not asserted subject to preclusion under *R.* 4:30A); *R.* 4:5–1 (requiring identification of any other pending or contemplated action in any other court or arbitration proceeding involving same controversy).

During the pendency of Olsen's action, *Rule* 4:27–1(b), the predecessor of *Rule* 4:30A, provided: "Each party to an action shall assert therein all claims which he may have against any other party thereto insofar as may be required by application of the entire controversy doctrine." *Rule* 4:30A replaced and modified *Rule* 4:27–1(b) by extending mandatory joinder beyond claims to parties. In this case, however, we are concerned only with the mandatory joinder of claims. Since September 10, 1979, when subparagraph (b) was added to *Rule* 4:27–1, the *Rules Governing the Courts of the State of New Jersey* have required the mandato-

ry joinder of all claims as required by the entire controversy doctrine. Thus, for ten years preceding the date of the accident that gives rise to Prevratil's claim, the rules of practice required defendants in personal-injury actions to assert their claims for personal injuries in the original action.

Generally speaking, the entire controversy doctrine requires whenever possible all phases of a legal dispute to be adjudicated in one action. At a minimum, all parties to a suit should assert all affirmative claims and defenses arising out of the underlying controversy. *Cogdell v. Hospital Ctr.*, 116 *N.J.* 7, 15, 560 *A.*2d 1169 (1989). The doctrine, which promotes the twin goals of efficient judicial administration and fairness, encourages the comprehensive and conclusive determination of a legal controversy. *Mystic Isle Development Corp. v. Perskie & Nehmad*, 142 *N.J.* 310, 322, 662 *A.*2d 523 (1995); *Crispin v. Volkswagenwerk, A.G.*, 96 *N.J.* 336, 349, 476 *A.*2d 250 (1984). It stems directly from the principles underlying the doctrine of *res judicata* or claim preclusion.

So deeply rooted in the administration of the judicial system is the doctrine that it attained constitutional status in the 1947 Constitution:

> Subject to the rules of the Supreme Court, the Law Division and the Chancery Division shall each exercise the powers and functions of the other division when the ends of justice so require, and legal and equitable relief should be granted in any cause so that all matters in controversy between the parties may be completely determined.

[*N.J. Const.* art. VI, § 2, ¶ 4].

Even before the 1947 Constitution, courts recognized the doctrine as an efficient means of administering justice. *See, e.g., Smith v. Red Top Taxicab Corp.*, 111 *N.J.L.* 439, 440–41, 168 *A.* 796 (E. & A. 1933) (stating that "[n]o principle of law is more firmly established than that a single or entire cause of action cannot be subdivided into several claims, and separate actions maintained thereon"); *Mantell v. International Plastic Harmonica Corp.*, 141 *N.J. Eq.* 379, 393, 55 *A.*2d 250 (E. & A. 1947) (declaring equity court may render "final determination of the

entire controversy" to further "the policy of avoiding 'a multiplicity of suits' ").

Early interpretations of the entire controversy doctrine led to rulings that the Chancery Division should adjudicate the legal issues of a case, even when the equitable issues had been determined previously. *Steiner v. Stein*, 2 *N.J.* 367, 378, 66 *A.2d* 719 (1949); *see also Tumarkin v. Friedman*, 17 *N.J.Super.* 20, 24, 85 *A.2d* 304 (App.Div.1951) (ruling that county court was authorized to resolve both legal and equitable issues of suit properly filed in its jurisdiction) *certif. denied*, 9 *N.J.* 287, 88 *A.2d* 39 (1952). In *Massari v. Einsiedler*, 6 *N.J.* 303, 313, 78 *A.2d* 572 (1951), the Court broadened the reach of the doctrine by requiring joinder of defenses. *See also Applestein v. United Bd. & Carton Corp.*, 35 *N.J.* 343, 356, 173 *A.2d* 225 (1961) (stating that a defendant "must assert all matters which will defeat a claim against him and a plaintiff must seek complete relief for vindication of the wrong he charges"). The Court precluded a claimant who had been a defendant in an earlier action from asserting a claim in a later action that could have been asserted as a defense in the earlier one. 6 *N.J.* at 311–12, 78 *A.2d* 572.

The Court in *Ajamian v. Schlanger*, 14 *N.J.* 483, 103 *A.2d* 9, *cert. denied*, 348 *U.S.* 835, 75 *S.Ct.* 58, 99 *L.Ed.* 659 (1954), extended the doctrine by precluding such proceedings by the plaintiff. The Court held that a plaintiff's failure to raise a claim for damages in a proceeding in which he had sought rescission of an allegedly fraudulent contract barred a later action for money damages. *Id.* at 488–89, 103 *A.2d* 9.

Justice Brennan, writing for the Court, explained that the procedural reform was

> designed and purposed for the just and expeditious determination in a single action of the ultimate merits of an entire controversy between litigants. It is a fundamental objective of this procedural reform to avoid the delays and wasteful expense of the multiplicity of litigation which results from splitting of a controversy.
>
> [*Id.* at 485, 103 *A.2d* 9.]

Moreover, "to sanction [one party's] holding in reserve his one available remedy for the purpose of attack in another suit, would

be utterly destructive of the policy.... 'To hold otherwise would be to revive one of the worst defects of the old order and to do violence to both the letter and the spirit of the new Constitution.'" *Id.* at 489, 103 *A.*2d 9 (quoting *State ex rel. Wm. Eckelmann, Inc. v. Jones,* 4 *N.J.* 374, 383, 72 *A.*2d 872 (1950)); *see also Falcone v. Middlesex County Medical Soc'y,* 47 *N.J.* 92, 219 *A.*2d 505 (1966) (stating that elemental considerations of fairness to other party and judicial economy dictate all of plaintiff's claims arising from same occurrence be joined in a single proceeding). In *Vacca v. Stika,* 21 *N.J.* 471, 122 *A.*2d 619 (1956), we further broadened the doctrine by requiring representative parties to assert counter-claims in one suit. *Id.* at 476, 122 *A.*2d 619; *see Korff v. G & G Corp.,* 21 *N.J.* 558, 571–72, 122 *A.*2d 889 (1956) (broadening doctrine to include defendant's counterclaim against nonresident plaintiff who voluntarily instituted a lawsuit in New Jersey).

The Appellate Division in *Wm. Blanchard Co. v. Beach Concrete Co.,* 150 *N.J.Super.* 277, 375 *A.*2d 675, *certif. denied,* 75 *N.J.* 528, 384 *A.*2d 507 (1977), identified the underlying transaction, not the nature of the plaintiff's cause of action, as defining the limit of the action. In a factually complex dispute, the Appellate Division barred a series of cross-claims and counterclaims that co-parties in an earlier action had failed to assert. *Id.* at 287, 375 *A.*2d 675. The court ruled that the entire controversy doctrine required that defendants assert not only claims deriving from plaintiff's cause of action, but also any and all cross-claims and counterclaims arising out of the underlying transaction. *Id.* at 294, 375 *A.*2d 675.

In the following year, the Appellate Division barred a share-holder's suit for alleged breach of an oral agreement to make a loan to the corporation, when the suit was brought two years after the corporation had lost a suit brought by the bank. *Malaker Corp. Stockholders Protective Comm. v. First Jersey Nat'l Bank,* 163 *N.J.Super.* 463, 468, 395 *A.*2d 222 (1978), *certif. denied,* 79 *N.J.* 488, 401 *A.*2d 243 (1979). Although the shareholders were not parties to the earlier action, the court dismissed the second suit on the basis of the entire controversy doctrine and *Rule* 4:7–1,

which requires mandatory joinder of counterclaims seeking liquidated damages. *Id.* at 496–500, 395 *A.*2d 222.

Thus the entire controversy doctrine encompasses "virtually all causes, claims, and defenses relating to a controversy." *Cogdell, supra,* 116 *N.J.* at 16, 560 *A.*2d 1169. In essence, "it is the factual circumstances giving rise to the controversy itself, rather than a commonality of claims, issues or parties, that triggers the requirement of joinder to create a cohesive and complete litigation." *Mystic Isle, supra,* 142 *N.J.* at 323, 662 *A.*2d 523 (citing *DiTrolio v. Antiles,* 142 *N.J.* 253, 267–68, 662 *A.*2d 494 (1995)).

In 1979, we incorporated into our court rules the policy of mandatory joinder of claims and defenses. Ultimately, the application of the doctrine depends on the exercise of judicial discretion in the facts of each case. *Mystic Isle, supra,* 142 *N.J.* at 323, 662 *A.*2d 523. Thus, equitable considerations can relax mandatory-joinder requirements when joinder would be unfair. *See ibid.* (noting that doctrine does not apply to bar component claims that are "unknown, unarisen, or unaccrued at the time of the original action"); *Cafferata, supra,* 251 *N.J.Super.* at 260, 597 *A.*2d 1101 (stating that doctrine does not bar transactionally-related claims of which party was unaware during pendency of prior litigation). In sum, the entire controversy doctrine compels litigants at the risk of preclusion to assert all claims in a single controversy.

The mandatory joinder of parties has evolved more tentatively than the mandatory joinder of claims. Before our decision in *Crispin, supra,* we had declined to extend the entire controversy doctrine to the mandatory joinder of parties. *See, e.g., Thornton v. Potamkin Chevrolet,* 94 *N.J.* 1, 5, 462 *A.*2d 133 (1983) (stating that "[t]he essence of that policy is the joinder of claims and not parties"); *Aetna Ins. Co. v. Gilchrist Bros., Inc.,* 85 *N.J.* 550, 556–60, 428 *A.*2d 1254 (1981); *McFadden v. Turner,* 159 *N.J.Super.* 360, 369, 388 *A.*2d 244 (App.Div.1978) (holding that entire controversy doctrine "[i]s a rule of mandatory joinder of claims, not of

parties," so plaintiff's suit against nurses for injuries sustained during stay at hospital may proceed even though verdict already won against hospital for same injuries). In *Crispin,* however, we recognized that joinder of known parties in a single pending action, especially in complex negligence cases, should be the norm. 96 *N.J.* at 343, 476 *A.*2d 250. Consistent with the equitable principles of the entire controversy doctrine, we decided to proceed on a case-by-case basis, "recognizing that the doctrine is one of judicial fairness and will be invoked in that spirit." *Ibid.*

Beginning with *Cogdell,* we extended the entire controversy doctrine to the joinder of parties. 116 *N.J.* at 26, 560 *A.*2d 1169. Shortly after rendering the decision in *Cogdell,* we adopted *Rule* 4:30A, thereby codifying the mandatory joinder of both claims and parties. Last year we applied the doctrine to four cases involving party joinder. *See Mortgagelinq Corp. v. Commonwealth Land Title Ins. Co.,* 142 *N.J.* 336, 662 *A.*2d 536 (1995) (barring claims against parties omitted from earlier action in another jurisdiction if jurisdiction was available in the first forum); *Mystic Isle, supra,* 142 *N.J.* at 325, 334, 662 *A.*2d 523 (barring legal-malpractice claims arising from real estate development suit because developer failed to join attorneys as defendants in first litigation); *Circle Chevrolet v. Giordano, Halleran & Ciesla,* 142 *N.J.* 280, 662 *A.*2d 509 (1995) (barring attorney-malpractice claims for failure to join attorneys and assert claims in underlying action against landlord for reformation of commercial lease agreement); *DiTrolio, supra,* 142 *N.J.* at 279, 662 *A.*2d 494 (barring physician's suit against members of hospital staff because of failure to join them as defendants in prior suit against hospital).

Those decisions have attracted some criticism from academicians and the bar. *See* Geoffrey C. Hazard, Jr., *An Examination Before and Behind the Entire Controversy Doctrine,* New Jersey Institute for Continuing Legal Education, Entire Controversy Doctrine, Seminar Material (1996) (criticizing the party-joinder requirements of the entire controversy doctrine as introducing unnecessary uncertainty into complex civil litigation, but noting

that claims-joinder decisions prior to *Cogdell* are consistent with the principles of *res judicata*); Albert L. Cohn & Terri A. Smith, *Practice and Malpractice after* Circle Chevrolet, New Jersey Institute for Continuing Legal Education, Entire Controversy Doctrine, Seminar Material (1996) (articulating the pitfalls created by requirement in *Circle Chevrolet* of mandatory joinder of attorneys for malpractice claims in underlying suit); *see also* Russ Bleemer, *First Thing You Do, Sue All the Lawyers,* 141 *N.J.L.J.* 1 (Aug. 7, 1995) (interpreting the court's opinions as stating "[s]ue early and sue everyone, including your own lawyer"). The criticism, however, is limited to the application of the entire controversy doctrine to the joinder of parties, particularly to the joinder of attorneys for the purpose of asserting potential malpractice claims. Whatever problems may inhere in party joinder do not apply to the issue in the present case, which concerns only the joinder of claims.

-III-

In 1989, when Olsen filed her action, neither the court rules nor the case law made any exception from the entire controversy doctrine for automobile cases. During the pendency of this appeal, the Appellate Division rendered conflicting decisions on the issue.

*Burrell v. Quaranta,* 259 *N.J.Super.* 243, 612 *A.2d* 379 (App.Div. 1992), involved facts almost identical to those in this case. Burrell was injured in a three-car accident. One driver initially filed an action against the other drivers, including Burrell. The insurance carrier's counsel represented Burrell in that action. Subsequently, Burrell filed a separate personal injury action against the same parties. The trial court barred Burrell's action on the basis of the entire controversy doctrine, and the Appellate Division affirmed.

In *Stebbins v. Robbins,* 278 *N.J.Super.* 439, 651 *A.2d* 486 (App.Div.1995), however, another part of the Appellate Division reached a contrary result. Stebbins was operating a jitney bus when a jeep collided with the bus. In three separate actions, the

jeep passengers sued the operators of both vehicles. Stebbins had retained personal counsel shortly after the accident, but had not asserted an affirmative claim in the original suit. After two of the cases settled, Stebbins filed a personal injury action against the owner and operator of the jeep. The court permitted Stebbins to maintain his personal injury action. It reasoned that a contrary result would deprive the plaintiffs of personal injury claims while relegating them to malpractice actions against their attorneys. *Id.* at 448, 651 *A.*2d 486. The Appellate Division declined to follow *Burrell,* stating that automobile-accident cases constituted an exception to the requirements of the mandatory joinder of claims. It reasoned further that the filing of a separate action during the pendency of another personal injury action would satisfy the entire controversy doctrine, because it would alert the court and other parties to all claims. *Id.* at 445, 651 *A.*2d 486.

In addition, the *Stebbins* court relied on an exception recognized in *Humble Oil & Ref. Co. v. Church,* 100 *N.J.Super.* 495, 242 *A.*2d 652 (App.Div.1968), which involved a collision of a tractor trailer, owned by Humble Oil, with two automobiles. In the first suit for wrongful death, an insurance company attorney represented Humble Oil, which subsequently filed an action for property damage. The Appellate Division allowed the property damage action to proceed primarily because the insurer, not the insured, had controlled the wrongful-death action. *Id.* at 498–99, 242 *A.*2d 652. The court also reasoned: "A property damage claim, a personal injury claim and a claim for contribution under the Joint Tortfeasors Contribution Law constitute separate claims for relief even though they all arise by reason of one tortious incident. Joinder of such claims is permissive, not mandatory." *Id.* at 500, 242 *A.*2d 652.

*Humble Oil* no longer supports the proposition that property damage and personal injury actions are necessarily distinct actions. First, at the time of the decision in *Humble Oil,* the joinder of claims was permissive, not mandatory. *See R.* 4:7–1; *see also Schweizer v. MacPhee,* 130 *N.J.Super.* 123, 325 *A.*2d 828 (App.Div.

1974) (distinguishing *Humble Oil* because claims there were permissive, not mandatory, counterclaims). Second, Humble Oil apparently had brought its property damage claim before its carrier settled the wrongful-death suit. *Humble Oil, supra,* 100 *N.J.Super.* at 497, 242 *A*.2d 652. *But see Stebbins, supra,* 278 *N.J.Super.* at 446 n. 1, 651 *A*.2d 486 (explaining that discrepancies in timing of *Humble Oil* litigations suggest wrongful-death action may have been resolved prior to filing of Humble Oil's property damage suit). Because all parties knew of the property damage claim during the first action, the holding comported with the entire controversy doctrine as it had evolved at that time. Even when *Humble Oil* was decided, however, the entire controversy doctrine would have barred a subsequent personal injury action instituted after the conclusion of a related action arising from the same accident.

We reject plaintiff's request to make an exception under *Humble Oil* for litigants represented by insurance counsel in the initial litigation. For decades, courts have discounted a plaintiff's representation in an earlier action by counsel provided by an insurer. *See Schweizer, supra,* 130 *N.J.Super.* at 127, 325 *A*.2d 828 (stating that "[t]he mere fact that an insurance carrier['s] . . . counsel defended, in no way demonstrates the inability of plaintiff to comply with the rules of the court"); *Burrell, supra,* 259 *N.J.Super.* at 254, 612 *A*.2d 379. Although an insurer may select the attorney to represent an insured, that "attorney owes his first allegiance to his client in the action, the insured, and bears the responsibility to represent him properly in all respects." *Molnar v. Hedden,* 260 *N.J.Super.* 133, 147, 615 *A*.2d 647 (App.Div.1992), *rev'd on other grounds,* 138 *N.J.* 96, 649 *A*.2d 71 (1994); *see also Lieberman v. Employers Ins.,* 84 *N.J.* 325, 336, 419 *A*.2d 417 (1980) (stating that insurance carrier has fiduciary duty to represent insured); *Rova Farms Resort, Inc. v. Investors Ins. Co.,* 65 *N.J.* 474, 492, 323 *A*.2d 495 (1974). Plainly stated, in any litigation, counsel for an insurer must put the insured's interests ahead of the insurer's. *Lieberman, supra,* 84 *N.J.* at 336, 419 *A*.2d 417.

-IV-

■ We reject any categorical exception of automobile negligence cases from the entire controversy doctrine. Since 1979, such cases, like other litigation, have been subject to the mandatory joinder of all claims arising from a controversy. This conclusion conforms with *Rule* 4:30A and with our long-standing practice of encouraging efficient and fair resolution of disputes by requiring all parties to bring their claims in one action. The doctrine admits of equitable exceptions to avoid harsh results. We stress however, that except as provided in *Rule* 4:64-5 (foreclosure actions) and *Rule* 4:67-4(a) (leave required for counterclaims or cross-claims in summary actions), all disputes, including automobile-negligence cases, initially are subject to the doctrine. Equitably enforced, as it has been in cases like *Cafferata* and *Burrell,* *Rule* 4:30A provides a sensible solution to addressing an ever-increasing docket.

The court system cannot afford the luxury of needless multiple actions. From November 1994 to October 1995, 128,274 civil actions were filed in New Jersey. Of those, 50,048 or thirty-nine percent, were automobile-negligence cases. We will never sacrifice justice for economic considerations, but we cannot ignore the cost to the public of such extensive litigation. All branches of government, including the judiciary, must strive to function efficiently, as well as fairly. The question is not whether the judiciary should provide a forum for the pursuit of claims for personal injuries in automobile-accident cases, but whether in providing such a forum, the judiciary should consider not only the rights of the injured party, but also the rights of the other parties and the public.

■ To prevent any problems arising from the failure of insureds to assert affirmative claims, insurance companies and their counsel should notify insureds of the requirement of mandatory joinder, explain that the insureds must join all related claims in a pending suit, and advise insureds of the need to seek the advice of personal counsel regarding affirmative claims. It is our

understanding, confirmed at oral argument, that insurance companies and their attorneys have been following that practice for years. Hence, we do not anticipate any practical problems with that procedure.

We also recognize the special considerations arising from the application of the entire controversy doctrine to automobile-insurance litigation, particularly when the initial action involves a claim for property damage in the Special Civil Part. Statistics provided by the Administrative Office of the Courts demonstrate that insurers increasingly resort to inter-company arbitration to resolve subrogation claims. Over a four-year period, automobile property damage claims declined from 10,414 in 1991 to 5,626 in 1995, a forty-six percent decrease. When an insured asserts a personal injury claim, the court may remand the entire action to the Law Division or sever the property damage action from the personal injury action. We are aware, moreover, that for decades insurance company counsel appearing for insureds have successfully resolved questions of representation when the insureds have retained their own counsel on personal injury claims. In sum, the problems are manageable.

In the present case, the trial court found that Prevratil knew of the pendency of the Olsen action. While that action was pending, moreover, he retained counsel to prosecute both a workers' compensation claim and a civil action for the injuries he allegedly sustained in the accident. Thus, ample evidence supports the judgment of the lower courts dismissal of Prevratil's complaint. Out of an abundance of caution, however, we are remanding the matter to the Law Division for further consideration in light of this opinion. The purpose of the remand is to permit the Law Division to consider the fairness of dismissal. The Law Division has already conducted a plenary hearing on certain issues, including Prevratil's knowledge of the pendency of the Olsen action. Hence, the court need not revisit that issue. Prevratil's counsel, however, may wish to bring other issues to the attention of the court. We do not suggest that the Law Division should reach a

different result. We leave to the sound discretion of the Law Division, moreover, the determination whether to permit the parties to supplement the record.

The basic flaw in the dissent is its failure to recognize that for seventeen years, the *Rules of Court* have required the mandatory joinder of claims in all civil actions, including those arising out of automobile accidents. Misplaced also are the dissent's concerns about the effect of the verbal threshold. One of the twin pillars of the entire controversy doctrine is fairness. In deciding whether to apply the doctrine, a trial court may consider whether an injured party lacks sufficient information to assert a claim because of the uncertainty about (a) the permanency of the loss of use of a body organ or member, *N.J.S.A.* 39:6A–8a (Type 7); (b) the significance of limitation of use of a bodily function or system, *id.* (Type 8); or (c) the extent of impairment of a non-permanent injury, *id.* (Type 9). Concerns about such matters need not deprive the courts, the parties, and the public of the benefits of a court system that is efficient, as well as fair. In the present case, moreover, such concerns are misplaced. Nothing indicates that they played any part in Prevratil's decision or that of his attorney not to file a claim in the Olsen action.

The judgment of the Appellate Division is reversed, and the matter is remanded to the Law Division.

STEIN, J., dissenting.

The Court is mesmerized by the entire controversy doctrine—so much so that its opinion, holding that the doctrine makes mandatory all counterclaims and cross-claims in automobile negligence cases, scarcely acknowledges that the prospective effect of non-compliance is to bar the later filing of meritorious claims, and never attempts to address whether that severe and extraordinary consequence is justified by specific benefits to the administration of justice. Not only is the Court's application of the doctrine to litigants represented by assigned insurance counsel unprecedented, unfair, and unjustified. More importantly, its insistence that

all persons injured in a motor vehicle accident file their claims in the same action, *or lose the right to sue,* utterly ignores the built-in delay and other practical realities that influence the management of automobile-negligence litigation. The Court's disposition will cause grave harm to innocent litigants and do virtually no good for the cause of case management.

# I

## A

The facts are garden-variety, typical of thousands of motor vehicle accident cases. Prevratil was driving a truck owned by his employer, Benjo Trucking Company (Benjo), and insured by Royal Insurance. He was rear-ended by a truck driven by George Mohr, owned by his employer Rich Hill Transportation (Rich Hill). Prevratil's truck was pushed into the rear of Janet Olsen's automobile. Olsen sued Prevratil, Benjo, Mohr, and Rich Hill in May, 1989. Benjo's carrier, Royal Insurance, assigned a law firm to represent Prevratil and Benjo. The law firm filed an answer and cross-claim for contribution on behalf of Prevratil, but asserted no claim for personal injuries. The record is silent on whether the law firm informed Prevratil that the entire controversy doctrine compelled him to join in that suit any claim for personal injuries or be barred from subsequently filing such a claim. In December 1989, Olsen settled her claim against Mohr and Rich Hill for $15,000 and dismissed her claims against Prevratil and Benjo.

About one year later, Prevratil sued Mohr and Rich Hill to recover damages for personal injuries he sustained in the accident. Relying on the entire controversy doctrine, defendants moved for summary judgment, contending that Prevratil should have filed his claim in the first action. Prevratil asserted that he was unaware of the first action, but the trial court conducted an evidentiary hearing and concluded that Prevratil knew of the Olsen litigation. No one contended that the insurer's lawyers had informed Prevratil that he was obligated to file his claim in the

original action. The trial court concluded, however, that irrespective of Prevratil's lack of knowledge that he was required to file his claim in the first action, the entire controversy doctrine barred his present claim. The Appellate Division affirmed, as does this Court, except to remand the matter to the Law Division to permit that court "to consider the fairness of dismissal." *Ante* at 196, 678 *A.*2d at 251.

B

The Court approaches the case doctrinally rather than pragmatically and arrives at the wrong answer because it poses the wrong question: "The primary issue is whether we should create an exception from the entire controversy doctrine for automobile negligence cases." *Ante* at 182, 678 *A.*2d 244. That question compels a negative answer, but the critical issue could have been more precisely framed this way: Are the policies underlying the entire controversy doctrine important enough to bar an innocent litigant from pursuing a meritorious personal injury claim because an insurer's lawyer, assigned to represent that litigant as a *defendant,* failed to make clear that the personal injury claim must be asserted in the action pending against him or her? That issue is virtually unaddressed by the Court.

The folly of the Court's holding can be illustrated by two hypotheticals. First, assume that Prevratil filed his cross-claim in the first action and that Olsen's claim did not settle. In accordance with current practice, the case undoubtedly would have been bifurcated and the liability issues tried first. Current statistics maintained by the Administrative Office of the Courts inform us that in Middlesex County, where this suit was filed, the median time from filing an automobile negligence action complaint for personal injuries to termination of a civil jury trial is 38.8 months. (The statewide figure is 33.5 months.) After the liability trial, both Olsen's and Prevratil's damage claims, had they not settled, probably would have been separately tried.

For comparison purposes, assume the same facts except that Prevratil filed his complaint in a separate action within the period allowed by the statute of limitations, but after the liability trial on Olsen's claim. (That chronology is unlikely because Prevratil's claim had to be filed within twenty-four months of the accident and, based on current statistics, the liability trial probably would have commenced some months after Prevratil's complaint was filed and the limitations period had expired.) In that event, Prevratil would be collaterally estopped from challenging in his own case the result of the liability trial in Olsen's case, *see, e.g., Colucci ex rel. Colucci v. Thomas Nichol Asphalt Co.,* 194 *N.J.Super.* 510, 517–18, 477 *A.*2d 403 (App.Div.1984), so that a second liability trial would be unnecessary. Assuming that Prevratil was not able to settle his claim, it undoubtedly would be resolved by a separate trial on damages only, as would Olsen's claim.

Thus, from a case management standpoint, whether Prevratil or a similarly situated defendant files an affirmative claim in the first action or in a subsequent action has little impact. Principles of collateral estoppel suggest that only one liability trial will be necessary and the damage claims will either be settled or separately tried in either event. The most likely result of permitting the claim to be filed in a second suit is that that action would be consolidated with the first suit, well in advance of the liability trial. Nor is the delay in filing the affirmative claim likely to cause prejudice. Sophisticated automobile liability carriers investigate automobile personal injury claims in sufficient detail to be informed of the identity of all persons injured in an accident and of the nature and extent of their injuries. Although we are uninformed by this record, a reasonable assumption is that the carrier for Mohr and Rich Hill knew that Prevratil sustained personal injuries in the accident long before Prevratil filed his claim, and in all probability had established a claim file in anticipation of Prevratil's filing suit.

Thus, the Court's holding is unlikely to have any useful effect on civil case management. The flurry of recently reported Appellate

Division decisions on the issue, see *infra* at 208–209, 678 *A*.2d at 257–258, suggests that attempts to apply the entire controversy doctrine in this context are a recent phenomenon, undoubtedly attributable to this Court's increased reliance on the doctrine. Prior practice would have allowed a claimant such as Prevratil to file his claim in a separate suit. Because that claim invariably would have been filed long before a liability trial in the first suit commenced, consolidation of the two actions would have been feasible and would have achieved the same effect as the Court's holding, without the unnecessary side effect of barring numerous meritorious claims.

The Court's opinion also ignores the practical effect of the verbal threshold, *N.J.S.A.* 39:6A–8a, set forth in New Jersey's no-fault, automobile-insurance statute, *N.J.S.A.* 39:6A–1 to –35. The verbal threshold provision, if elected by persons purchasing automobile insurance, allows recovery for non-economic losses resulting only from those personal injuries that fit into one of nine specified categories. Those categories are set forth in *N.J.S.A.* 39:6A–8a:

TYPE 1: death;

TYPE 2: dismemberment;

TYPE 3: significant disfigurement;

TYPE 4: a fracture;

TYPE 5: loss of a fetus;

TYPE 6: permanent loss of use of a body organ, member, function or system;

TYPE 7: permanent consequential limitation of use of a body organ or member;

TYPE 8: significant limitation of use of a body function or system;

TYPE 9: a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute that person's usual and customary daily activities for not less than 90 days during the 180 days immediately following the occurrence of the injury or impairment. . . .

[*Oswin v. Shaw,* 129 *N.J.* 290, 315, 609 *A*.2d 415 (1992).]

As this Court noted in *Oswin, supra,* several of those categories are "elusive of clear interpretation." *Ibid.* More to the point, the time period necessary for a plaintiff injured in an automobile accident to ascertain whether he or she has a sustainable cause of

action for non-economic injuries may vary substantially. Those plaintiffs who select the traditional tort option, which allows unrestricted recovery of non-economic damages, see *N.J.S.A.* 39:6A–8b, as well as "verbal threshold" plaintiffs who sustain fractures or significant disfigurement, for example, need not await the result of prolonged medical treatment before filing suit. But those verbal threshold plaintiffs relying on category 7, 8, or 9 as the basis for claiming entitlement to non-economic damages may not, for many months following the accident, possess sufficient information to enable a lawyer to determine whether their injuries satisfy the verbal threshold. To require such claimants to file their suit as a counterclaim or cross-claim in the first action arising out of an accident may unfairly and unnecessarily deprive them of the full benefit of the statute of limitations.

Regrettably, the majority has made no attempt to analyze the practical implications of its holding or to offer any pragmatic justification for a decision that inevitably will deprive innocent litigants of the right to file meritorious claims, implying that the entire controversy doctrine justifies itself. The Court pays lip service to the preclusive effect of its decision, without any attempt to explain what administrative goals it advances: "We will never sacrifice justice for economic considerations, but we cannot ignore the cost to the public of such extensive litigation." *Ante* at 195, 678 *A.*2d at 250. Those words ring hollow in the face of statistical and pragmatic evidence that the Court's ruling will have little or no impact on the management of litigation, other than to encourage the filing of motions to dismiss based on the entire controversy doctrine. A decision that deprives New Jersey citizens of access to our courts should stand on firmer ground.

## II

The Court's decision not only fails the test of pragmatism. It also fails the test of fairness. In applying the entire controversy doctrine, this Court, until recently, has "proceed[ed] on a step-by-step basis recognizing that the doctrine is one of judicial fairness

and will be invoked in that spirit." *Crispin v. Volkswagenwerk, A.G.,* 96 *N.J.* 336, 343, 476 *A.*2d 250 (1984). Never before today has this Court held applicable the preclusive effects of the doctrine to a party whose failure to assert a claim was attributable not to the omission of retained counsel, but to the omission of counsel *assigned by an insurance company* to represent its own interests as well as the interests of the affected party. Moreover, the leading cases establishing and applying the entire controversy doctrine as a bar to the subsequent assertion of omitted claims appear to have involved deliberate and calculated claim-splitting strategies designed to frustrate the orderly administration of justice, as opposed to an innocent omission by an uninformed litigant.

Thus, in *Massari v. Einsiedler,* 6 *N.J.* 303, 78 *A.*2d 572 (1951), the plaintiff sued to recover the unpaid balance of the purchase price on the sale of a business, and the defendant asserted in its answer that subsequent loan and security trust agreements not signed by the plaintiff altered the payment terms of the original contract. Massari was awarded summary judgment. Einsiedler then instituted a new action to reform the original contract in accordance with the terms of the subsequent agreements. Holding that the second action was barred by *res judicata,* this Court observed that an objective "of the Judicial Article of the 1947 Constitution was to facilitate . . . the hearing of causes by disposing of all matters . . . arising in a controversy in one trial." *Id.* at 307, 78 *A.*2d 572. The Court held that Einsiedler was obligated to assert the alleged grounds for reformation in the first action, and having failed to do so was deemed to have waived the defense. *Id.* at 312–13, 78 *A.*2d 572.

Similarly, in *Ajamian v. Schlanger,* 14 *N.J.* 483, 103 *A.*2d 9, *cert. denied,* 348 *U.S.* 835, 75 *S.Ct.* 58, 99 *L.Ed.* 659 (1954), the purchaser of a business sued for rescission based on the seller's fraudulent representations, the defendant asserting in response that the purchaser had nevertheless ratified the contract. After a judgment for defendant, the purchaser assigned the claim to his

brother, a New York attorney, who filed suit in the Law Division seeking damages for the alleged deceit. Reversing the lower courts, this Court held that the damages action was barred. In one of the earliest formulations of the entire controversy doctrine, Justice Brennan observed:

> To tolerate his pressing of the pursuit for rescission, even though futile from the outset, to the limits to which it was carried here after the clear warning of its infirmities when the opportunity to shift his ground was still open to him, and to sanction his holding in reserve his one available remedy for the purpose of attack in another suit, would be utterly destructive of the policy to avoid multiplicity of litigation.
>
> [*Id.* at 488–89, 103 *A.*2d 9.]

Although the Court relied principally on the merger of equitable and legal powers in the Superior Court under the 1947 Constitution as the basis for its decision, standard principles of *res judicata* would have led to the same result. *See Restatement (Second) of Judgments* § 24(1) (1982); Geofrey C. Hazard, Jr., *An Examination Before and Behind the Entire Controversy Doctrine*, at 9, New Jersey Institute for Continuing Legal Education, Entire Controversy Doctrine, Seminar Material (1996). As in *Massari, supra,* there was compelling justification for barring the assertion in a second suit of a claim that could have been advanced in the first suit, and no hint that the Court's disposition was unfair to the unsuccessful litigant.

*Falcone v. Middlesex County Medical Society,* 47 *N.J.* 92, 219 *A.*2d 505 (1966), applied the entire controversy doctrine in a context analogous to *Ajamian, supra,* holding that a physician who had obtained a Law Division judgment compelling his admission to the Middlesex County Medical Society could not thereafter maintain a new action against the Society to recover damages. *Id.* at 94–95, 219 *A.*2d 505. As in *Ajamian,* that result also was consistent with *res judicata* principles.

In *William Blanchard Co. v. Beach Concrete Co., Inc.,* 150 *N.J.Super.* 277, 375 *A.*2d 675, *certif. denied,* 75 *N.J.* 528, 384 *A.*2d 507 (1977), the Appellate Division issued a ringing endorsement of the mandatory claim joinder aspect of the entire controversy doctrine, not in the context of barring omitted claims in a subse-

quent action but rather in affirming a trial court's ruling barring an amended complaint seeking to assert claims that deliberately had been withheld from a pending action. The case involved multiple parties engaged in the construction of an office building that had been delayed over difficulties in installing concrete facade panels. Although the owner and general contractor had agreed to arbitrate their disputes, other parties instituted litigation in Essex County in 1970 and in Union County in 1972. Progress in those suits was impeded by the existence of various arbitration agreements among the parties and by the owner's and general contractor's desire to present a united front and withhold from the litigation claims against each other. In 1973, all parties agreed to waive arbitration, but efforts at settlement in the spring of 1975 were frustrated by the refusal of the owner and general contractor to assert delay claims against each other that would affect the other parties. The trial court ordered the claims to be filed and subsequently ruled that the principles underlying the entire controversy doctrine required dismissal of the amended pleadings with prejudice, because they would delay unreasonably the ultimate resolution of the case. Affirming the dismissal of the amended pleadings, the Appellate Division explained the necessity for case-by-case analysis in applying the entire controversy doctrine:

> [I]t is also apparent that the task of definitionally circumscribing the outer limits of a given controversy for purposes of application of the [entire controversy] doctrine is inordinately difficult. As a practical matter, the doctrine cannot be dealt with on an *a priori* basis. It must be applied empirically. That is to say, an evaluation must be made of each potential component of a particular controversy to determine the likely consequences of the omission of that component from the action and its reservation for litigation another day. If those consequences are likely to mean that the litigants in the action as framed will, after final judgment therein is entered, be likely to have to engage in additional litigation in order to conclusively dispose of their respective bundles of rights and liabilities which derive from a single transaction or related series of transactions, then the omitted component must be regarded as constituting an element of the minimum mandatory unit of litigation....
>
> The point, of course, is that a component of the controversy may not be unfairly withheld, and a withholding is by definition unfair if its effect is to render the pending litigation merely one inning of the whole ball game.
>
> [150 *N.J.Super.* at 293–94, 375 *A.*2d 675 (citations omitted).]

Other cases have applied the entire controversy doctrine to bar claims asserted in a second action that appeared to have been strategically withheld from an earlier action. *See, e.g., Tall Timbers Property Owners Ass'n v. Tall Timbers, Inc.*, 217 *N.J.Super.* 119, 122, 524 *A*.2d 1315 (App.Div.1987) (precluding, under entire controversy doctrine, claims in subsequent suit against former owners of campground that plaintiff intentionally withheld from prior chancery action to facilitate settlement); *Mori v. Hartz Mountain Dev. Corp.*, 193 *N.J.Super.* 47, 53–55, 472 *A*.2d 150 (App.Div.1983) (dismissing, under entire controversy doctrine, claims asserted in second action by co-owner of property seeking compensation for value of his interest and holding that such claims were required to be asserted in prior action by other owner to compel sale of property).

Thus, the primary cases announcing and applying the claim joinder aspect of the entire controversy doctrine generally are characterized by claims deliberately or strategically withheld from prior litigation by relatively sophisticated litigants. With perhaps one exception, neither the leading cases nor any of the reported cases applying the entire controversy doctrine to bar a claim in a second action have involved, as this case does, a litigant who was represented by counsel designated by an insurance company responsible to defend the prior action.

A number of cases demonstrate that the doctrine is not to be rigidly applied and that case-by-case evaluation is the only appropriate methodology for ascertaining its proper scope. *See, e.g., Woodward–Clyde Consultants v. Chemical & Pollution Sciences, Inc.*, 105 *N.J.* 464, 472–74, 523 *A*.2d 131 (1987) (declining to apply entire controversy doctrine to dismiss action alleging claim identical to counterclaim in prior action that had been dismissed without prejudice for failure to comply with discovery order); *Thornton v. Potamkin Chevrolet*, 94 *N.J.* 1, 5, 462 *A*.2d 133 (1983) (holding that entire controversy doctrine did not bar discharged employee from asserting racial discrimination claim before Division of Civil

Rights notwithstanding employee's failure to assert discrimination claim in prior grievance arbitration); *Cafferata v. Peyser*, 251 *N.J.Super.* 256, 261–63, 597 *A.*2d 1101 (App.Div.1991) (reversing summary judgment dismissing plaintiff's malpractice claim and holding that equitable origins of entire controversy doctrine did not warrant its application to bar malpractice action based on plaintiff's failure to assert that claim in Special Civil Part action brought by defendant to collect bill for medical services); *Brown v. Brown*, 208 *N.J.Super.* 372, 383, 506 *A.*2d 29 (App.Div.1986) (declining on basis of equitable considerations to apply entire controversy doctrine to bar tort action filed by victim of marital tort committed during pendency of divorce action, where plaintiff's divorce attorney refused to file claim in divorce action and defendant made no effort to consolidate tort action with pending equitable distribution proceedings in divorce action).

To the extent that our courts have had occasion to consider the mandatory claim joinder aspects of the entire controversy doctrine where the failure to assert a claim occurred in a case in which an insurance carrier was the real party in interest, the doctrine generally has been held not to apply. For example, in *Humble Oil & Refining Co. v. Church*, 100 *N.J.Super.* 495, 242 *A.*2d 652 (App.Div.1968), a three-vehicle collision involving a tractor-trailer owned by Humble and automobiles owned by Church and Gale generated a wrongful death action against the owners of the vehicles by the representative of a passenger in the Church vehicle who died as a result of the accident. Humble was represented by its insurer's designated counsel, who filed cross-claims for contribution in Humble's behalf. Church and Humble paid $25,000 to settle the action in 1968. In 1966, Humble filed suit against Church and Gale to recover for damages to its truck and trailer, and the trial court granted Church's motion to dismiss, apparently on the basis of the entire controversy doctrine. The Appellate Division reversed, holding inapplicable the entire controversy doctrine primarily on the ground that Humble's insurer controlled the negligence action and its settlement, and implying that to bar Humble from asserting its claim for property damage

would be inequitable because Humble did not control the prior litigation. 100 *N.J.Super.* at 499–500, 242 *A.*2d 652.

Similarly, in *Reardon v. Allen,* 88 *N.J.Super.* 560, 564–65, 213 *A.*2d 26 (Law Div.1965), a collision between vehicles owned by Dennis Reardon and James Allen resulted in injuries to Reardon's wife, Rose, and daughter, Kathleen, and to Conyers, a passenger in Allen's vehicle. Reardon carried collision insurance and, after paying his claim, his carrier instituted a subrogation action against Allen and recovered a judgment, which was satisfied. Rose and Kathleen Reardon then filed suit against Allen based on their personal injuries, Dennis Reardon suing *per quod.* Conyers filed suit against Allen and Reardon. Allen sought to dismiss Dennis Reardon's claim under the entire controversy doctrine, because he failed to assert that claim in the subrogation action in which he was the named plaintiff. Holding that Reardon's *per quod* claim was not precluded, the court observed:

> The insurance company has become the owner of the property damage claim, the true party in interest, and its own attorneys control the litigation. Although the property damage action was brought in the name of Dennis Reardon, he was merely a formal party, one without control over the action and without a proprietary or financial interest in its outcome....
>
> [*Id.* at 564, 213 *A.*2d 26.]

*See also Isaacson v. Boswell,* 18 *N.J.Super.* 95, 99–100, 86 *A.*2d 695 (App.Div.1952) (holding that settlement of Boswell's prior property damage action by Isaacson's insurance carrier did not preclude Isaacson from prosecuting separate action to recover for property damage to his vehicle); *De Carlucci v. Brasley,* 16 *N.J.Super.* 48, 52–53, 83 *A.*2d 823 (Law Div.1951) (holding that insurance carrier's settlement of one defendant's counterclaim against plaintiff did not preclude plaintiff from maintaining action for personal injuries and property damage against that defendant). Although the issue is somewhat different from that presented by this appeal, courts in other jurisdictions are in agreement that a plaintiff's right to assert an affirmative claim should not be adversely affected by his insurance carrier's settlement of the prospective defendant's prior suit. *See U.S.A.C. Transport, Inc. v. Corley,* 202 *F.*2d 8, 11–12 (5th Cir.1953); *Fikes v. Johnson,* 220

*Ark.* 448, 248 *S.W.*2d 362, 364 (1952); *Lohman v. Woodruff,* 224 *Kan.* 51, 578 *P.*2d 251, 254 (1978); *Graves Truck Line, Inc. v. Home Oil Co.,* 181 *Kan.* 507, 312 *P.*2d 1079, 1081–82 (1957); *Faught v. Washam,* 329 *S.W.*2d 588, 594 (Mo.1959), *overruled on other grounds, Tune v. Synergy Gas Corp.,* 883 *S.W.*2d 10, 20–22 (Mo.1994); *City of Chattanooga v. Ballew,* 49 *Tenn.App.* 310, 354 *S.W.*2d 806, 807–08 (1961).

The majority ignores the claim joinder problem presented when an insurance carrier is the real party in interest, blithely asserting that "[f]or decades, courts have discounted a plaintiff's representation in an earlier action by counsel provided by an insurer." *Ante* at 194, 678 *A.*2d at 250. It turns out, however, that the "for decades" reference embraces only *one* case, *Schweizer v. Mac Phee,* 130 *N.J.Super.* 123, 325 *A.*2d 828 (App.Div.1974), which was decided solely on the basis that the omitted counterclaim was mandatory under *Rule* 4:7–1 because it was "liquidated or capable of being asserted by calculation." *Id.* at 125, 325 *A.*2d 828.

Although the majority concedes that the entire controversy doctrine "stems directly from the principles underlying the doctrine of *res judicata* or claim preclusion," *ante* at 187, 678 *A.*2d at 246, the Court fails to acknowledge that generally accepted principles of *res judicata* and collateral estoppel would not bar Prevratil's claim in the second action. See *Restatement, supra,* § 22 cmt. b, illus. 1; see also *id.* § 27 cmt. e:

> A judgment is not conclusive in a subsequent action as to issues which might have been but were not litigated and determined in the prior action.... The interests of conserving judicial resources, of maintaining consistency, and of avoiding oppression or harassment of the adverse party are less compelling when the issue on which preclusion is sought has not actually been litigated before.
>
> . . . .
>
> Sometimes the party against whom preclusion is asserted is covered by an insurance policy and represented by insurance company counsel in the prior action but not in the subsequent action. In such instances, preclusion with respect to unlitigated issues seems particularly unfair.

Nor is the Court's apparent zeal for a more expansive entire controversy doctrine restrained by the sharp division in the Appellate Division over the issue before us. Two panels of that court

have concluded that the doctrine should apply in these circumstances, see *Prevratil v. Mohr*, 279 *N.J.Super.* 652, 653 *A.*2d 1190 (1995), and *Burrell v. Quaranta*, 259 *N.J.Super.* 243, 612 *A.*2d 379 (1992), and two Appellate Division panels have reached the opposite conclusion. See *Stebbins v. Robbins*, 278 *N.J.Super.* 439, 651 *A.*2d 486 (1995) and *Goodwin v. Morgan*, No. A-640-93T2 (Feb. 16, 1995). The facts in *Stebbins* offer a good example of the potential problems inherent in the majority's holding. Stebbins drove a bus in which his wife, Marion, and ten others were passengers. In July 1989, a jeep owned by Zinman Furs, Inc. and driven by Daniel Robbins went through a red light and struck the bus. Between April and July 1990, passengers Skinner, Clisham, and Danley filed separate actions against Stebbins, Robbins, and Zinman Furs. In the Skinner and Clisham suits, an attorney assigned by Stebbins' insurance carrier filed answers and cross-claims for contribution and indemnification, but no affirmative claims. The Danley and Skinner cases were resolved without trial in September and October 1990. In the meantime, between September 1989 and June 1991, personal counsel retained by Stebbins and his wife sent seventy-eight letters to defendants' insurance company enclosing medical reports and bills. In January 1991, Stebbins learned that he had two herniated cervical discs, and he learned in May or June 1991, that he required surgery. Stebbins filed suit on June 27, 1991. In declining to apply the entire controversy doctrine to bar Stebbins's suit the Appellate Division observed:

> The possible inequities which could visit a person injured in an automobile accident who is made a defendant in a personal injury action and provided a defense by his insurance company is well illustrated in this case. Stebbins knew he was injured and retained an attorney within days of the accident; however, he learned of the true nature of his injury only five months before he commenced suit and learned of the need for surgery approximately one month before he commenced suit. Early joinder could have precipitated a premature settlement of Stebbins's claims. Furthermore, the prosecution of Joseph Stebbins's personal injury claim and the defense of the Skinner, Clisham and Danley actions would have been to some degree at cross purposes. Insurance defense counsel was determined to shield or minimize Stebbins's liability and secondarily the insurer's financial responsibility. To that end settlements were effected in which Stebbins contributed 10% to the Clisham settlement and presumably other funds to the

Skinner and Danley settlements. His personal counsel, however, sought to maximize his recovery and any acknowledgment of negligence and contribution to a settlement could be utilized to diminish his award.

Finally, we note Robbins was not prejudiced. His insurance company had been aware of the Stebbins injury, the extent and cost of his treatment and the serious nature of the injury for over a year and a half before this last suit was filed. [278 *N.J.Super.* at 449–50, 651 *A*.2d 486.]

*See also* 7C John A. Appleman, *Insurance Law and Practice* § 4681, at 8 (Berdal ed.1979) ("The filing of the counterclaim may be also highly destructive of an otherwise proper defense * * * [T]o give the insured the right to bring a counterclaim, under these circumstances, is to effectively destroy the insurer's right to control litigation involving its insured.").

### III

The framers of the Judicial Article of the 1947 Constitution would be appalled to learn that the "fusion of the powers of Law and Chancery in one Superior Court," designed to avoid the delay and duplication that results from "the splitting of a controversy," *Ajamian, supra,* 14 *N.J.* at 485, 103 *A*.2d 9, has been transformed into a bureaucratic procedural snare that closes the courthouse doors to innocent litigants with meritorious claims. The Court ignores at its peril the profound words of Justice Jacobs, one of the primary authors of the Judicial Article: "[A]fter all, justice is the polestar and our procedures must ever be moulded and applied with that in mind." *New Jersey Highway Auth. v. Renner,* 18 *N.J.* 485, 495, 114 *A*.2d 555 (1955).

The Court overstates the record when it asserts that counsel at oral argument informed us that "insurance companies and their attorneys have been following [the] practice for years" of notifying insureds that they "must join all related claims in a pending suit." *Ante* at 195–196, 678 *A*.2d at 250–251. Respondent's counsel informed us only that *his* firm followed that practice, without any indication of when it commenced. Significantly, the record in this case and in the three other Appellate Division decisions on point reveal that insurance counsel in those cases did not so inform their assigned client, suggesting that the practice is far from universal.

·

If such a practice has developed, it is of very recent vintage—within the last five years—and it is hardly a failsafe. The insurance bar surely can devise a notice warning of the possible entire controversy bar and instructing clients to retain personal counsel. Predictably, many, if not most, of those clients will heed the warning and attempt to join their suit with the pending action. But inevitably, recognizing human nature and communication barriers, there will be those who fail to receive or comprehend the warning. Language barriers, difficulty in reaching the insurance company lawyer by telephone, the fact that insurance counsel is motivated primarily by a desire to avoid malpractice liability and may not be interested in engaging the client in extended discussion, problems of comprehension—all those factors suggest to the Court that we must surely anticipate that every year, throughout this State, innocent litigants will be insufficiently informed and will file separate suits, only to be confronted with motions to dismiss based on the entire controversy doctrine.

The Court's apparent response is that "[i]n sum, the problems are manageable." *Ante* at 195, 678 *A.*2d at 250. But why should such litigants be relegated to the unsatisfactory option of a malpractice action against their insurance company lawyers, in view of our consistent recognition that "the paramount policies of our law require * * * that the plaintiff be afforded an opportunity to have the claim adjudicated on the merits?" *Crispin, supra,* 96 *N.J.* at 338, 476 *A.*2d 250. As noted, in our past pronouncements, we have assured the bar and the public that we would "proceed on a step-by-step basis recognizing that the [entire controversy] doctrine is one of judicial fairness and will be invoked in that spirit." *Id.* at 343, 476 *A.*2d 250. Having made that commitment, why should the Court take this step, one that virtually guarantees that innocent litigants will lose their chance to assert meritorious claims for personal injuries?

The Court appears to be impelled by the view that because expansive joinder of claims is desirable, it must necessarily be

compulsory, a view with which some have expressed strong disagreement:

> It is also far from obvious that the duty to join a party ought to be enforced through the subsequent preclusion of that claim. While it may, in some circumstances, be efficient to resolve multiple claims in a single proceeding, it does not follow that the best way to achieve joinder is by making an example out of noncompliant litigants. We typically reserve the penalty of forfeit where there is no satisfactory alternative.
>
> [Allan R. Stein, *Power, Duty, and the Entire Controversy Doctrine,* New Jersey Institute for Continuing Legal Education, Entire Controversy Doctrine, Seminar Material 1 (1996) (Power, Duty, and the Entire Controversy Doctrine).]

Alternatives to claim preclusion also may warrant consideration. For example, *Rule* 4:5–1(b)(2), adopted to implement the philosophy of the entire controversy doctrine, *see* Sylvia B. Pressler, *Current N.J. Court Rules,* cmt. to *R.* 4:5–1, requires that parties include with their first pleading a certification stating whether any other action involving the same subject matter is pending *or is contemplated.* Enforcement of that Rule could shift the burden to insurance counsel to make diligent inquiry of an assigned defendant to determine whether that client *contemplates* filing a personal injury action, and the resulting certification would at least alert other parties and the trial court of that likelihood.

Before the Court interprets the entire controversy doctrine to mandate claim preclusion in the context presented by this appeal, it should acknowledge what it does *not* know—whether any real benefit to the administration of justice will accrue from a decision that makes mandatory all counterclaims and cross-claims in automobile personal injury actions. The ultimate answer to that question is *not* found in *Rule* 4:30A, which sets forth the entire controversy doctrine, nor in our precedents, because the usefulness of claim preclusion in this context depends entirely on whether it would significantly enhance the ability of trial courts to manage such litigation. That question obviously is more administrative than decisional, and prudence would at least suggest that the Court defer its determination pending a reference to and report from the Civil Practice Committee that would better inform the Court about the practical implications of its determination. As

noted, *supra* at 198–202, 678 *A*.2d at 251–254, my strong belief is that claim preclusion in this context will be of minimal value because the end of the limitations period for the defendant's unfiled complaint usually will occur months before the jury trial in the initial action, thereby permitting consolidation in most instances. Moreover, one of the harms that the Court's decision will cause is to compel many litigants to file their complaints prematurely to comply with the Rule, rather than await the result of their medical treatment.

But the fundamental harm done here is institutional. The judiciary exists to dispense justice, not deny it. We act in conflict with our most basic duty and function when we adopt rules or announce decisions that close the courthouse doors even to a single deserving litigant. The public that we serve is entitled to take for granted that when we act to bar meritorious claims we do so cautiously and reluctantly, and proceed only because the administrative goals that we advance are so essential and beneficial to the administration of justice as to warrant the adoption of a preclusionary rule. The Court falls far short of that standard here. Perhaps a football analogy can make the point better than I:

One of my favorite running backs, Ricky Watters, drew a lot of criticism last year when, in explaining why he didn't try to catch a pass in front of a defender poised to take his head off, asked rhetorically "for who, for what?" I take it that that inquiry *is* sometimes appropriate. It is particularly appropriate where rights are being forfeited. For whom? For what? Without a more compelling answer than the court has proffered to date, justice is not served.

[*Power, Duty, and the Entire Controversy Doctrine, supra,* at 5.]

## IV

I would reverse the judgment of the Appellate Division and remand the matter to the Law Division for trial.

*For reversal and remandment*—Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and COLEMAN—5.

*For reversal and remandment on other grounds*—Justice STEIN—1.